## Stevenson's Executor *versus* Stevenson *et al.*

The sound and disposing mind required to constitute testamentary capacity, is one in which the testator is shown to have had, at the making of his will, a full and intelligent consciousness of the nature and effect of the act he was engaged in; an understanding of the disposition he wished to make of his property by will; and of the persons and objects he desired to participate in his bounty.

If a testator design to give the whole of his estate to a stranger, to the exclusion of his collateral relations, it is not necessary that he should have a recollection of the property he intends to dispose of, or of persons who are thus related to him. Distribution not being the thing attempted, a competency to distribute is not the test of mental capacity.

ERROR to the Common Pleas of *Franklin county*.

This was an issue *devisavit vel non*, directed by the Register's Court, to try the validity of the last will and testament of Daniel Stevenson, deceased; wherein J. Smith Grier, the executor named in the said will, was plaintiff, and William Stevenson and others, the collateral relations and heirs at law of the alleged testator, were defendants.

Daniel Stevenson, the testator, died of consumption, on the 23d December 1856, after an illness of several weeks, at the age of about sixty years. He made his will five days before his death, and thereby, after giving a trifling legacy to his housekeeper, he devised and bequeathed the whole of his estate, real and personal, valued at about $14,000, to John D. Grier, who was not in any way related to him; and appointed J. Smith Grier, the brother and partner of the said John D. Grier, his executor.

The testator was an intelligent man, but of somewhat eccentric habits. He died unmarried and childless. The nearest of his blood were the children of deceased brothers and sisters; and with them he had quarrelled some eight or ten years before his death, and from that time, though living next door to some of them, had not spoken or had any communication with them.

At the instance of John D. Grier, who was his tenant, and who was frequently sent for by him during his last illness, to look after his business, &c., a will was prepared, bequeathing his property to his collateral relations, according to the intestate laws, and appointing Grier his executor. When this paper was read to him, he declared that it was not his will, and sent for his counsel, and dictated and executed the will in question.

The day after its execution, one of his counsel and Dr. Senseny visited Stevenson, and informed him that the contents of his will had been by some means divulged; and that it was charged, that he was of unsound mind. The testator then repeated his will, clause by clause, to Dr. Senseny, told him that he had reflected

[Stevenson's Executor *v.* Stevenson *et al.*]

over it, and was satisfied with it.   Four days afterwards he died.
The only question before the court was, as to the mental capacity
of the testator.

On the trial, the plaintiffs' counsel requested the court to charge
—That it is the duty of the jury to direct their attention to the
time when this will was made, and if they believe, from the testi-
mony, that, at that time, when Daniel Stevenson dictated to the
scrivener what his will was, and when it was written, and signed
by him, he had that amount of mind which enabled him to know
and understand what property he had, and how he wished to dis-
pose of it—the will is binding; and this, although the jury may
believe that, at other times, either before or after, the mind and
memory of the testator may have been affected by delirium.

The following points were presented by the defendant's coun-
sel :—

1. That if the jury believe that the testator was of memory, at
the time of making his alleged will, to answer usual and familiar
questions, but had not a sound and disposing memory, so as to be
able to make a disposition of his estate with understanding and
reason, and had not a recollection of the property he meant to
dispose of, *of the persons who were the natural objects of his
bounty, and the manner in which it was to be distributed between
them*, their verdict should be for the defendants.

2. If Daniel Stevenson, by reason of excessive drink, or by
other causes, during the last six or eight years of his life, had
come to believe, that his relatives were worthless and treacherous
people, and were scheming to inherit his property, when in truth
his relatives were respectable and honest people, and were forming
no such plots to get his property, and if such delusion continued
to increase as his mind grew weaker, and his pretended will was
made under its influence; then such paper is not his will, and the
verdict should be for the defendants.

The court below (KIMMELL, P. J.) affirmed each of these points;
the plaintiff excepted to the affirmance of those of the defend-
ants; and a verdict having been rendered against the will, he
removed the cause to this court, and here assigned the same, *inter
alia*, for error.

*F. Watts* and *Reilly & Sharp*, for the plaintiff in error, cited
Dornick *v.* Reichenback, 10 *S. & R.* 84; Leech *v.* Leech, 9 *Harris*
69; McMasters *v.* Blair, 5 *Casey* 303; 4 *W. C. C.* 262; 3 *Id.*
586.

*Stevens, Brewer, Nile & Kennedy, McClintock*, and *W. Adams*,
for the defendants in error, cited 1 *Jarm. on Wills* 28 b.; Mc-
Taggart *v.* Thompson, 2 *Harris* 149; Rambler *v.* Tryon, 7 *S. &*

*R.* 90; Chess *v.* Chess, 1 *Penn. R.* 32; Irish *v.* Smith, 8 *S. & R.* 573; Grabill *v.* Barr, 5 *Barr* 441.

The opinion of the court was delivered by

WOODWARD, J.—The sound and disposing mind required by law to constitute testamentary competency, is, perhaps, as well defined and illustrated by what was said in Leech *v.* Leech, 9 *Harris* 69, and McMasters *v.* Blair, 5 *Casey* 303, as by anything to be found in the books on this much vexed question.

The point submitted on behalf of the plaintiff, was so framed as to be consistent with the doctrine of these cases; and adapted, also, to the particular circumstances of the present case.

The court affirmed the point, and if the learned judge had not given unqualified sanction to the *defendant's* points, which, in some degree, were irreconcilable with the plaintiff's, there would have been nothing on the record to object to in a court of error; for, whatever might be thought of the verdict, nothing could be done here to correct that. Taking the instructions altogether, which are to be inferred from an affirmance of all the points, we think they were not such as the case demanded, and that the jury were misguided.

Stevenson, the testator, seems to have been a man of strongly marked character—jealous, distrustful, and indulging, at times, groundless prejudices against his kindred; but we see no evidence to justify the inquiry suggested in the defendant's 2d point, touching a mental delusion of six or eight years' standing. During his life, his kinsfolk did not account him a lunatic, nor a victim of any overmastering delusion, for they permitted him to take care of himself, and to conduct his business, without interference or assistance on their part. Nor should we have been likely to hear of any mental delusion, if he had not given his estate to a stranger to his blood. · But this was only an exercise of that dominion which the law gave him over his property. His objections to his kindred may have been unreasonable, but his *jus disponendi* was absolute, if there was mental competence when the will was made. The circumstance that he exercised his rights in such a way as to disappoint the natural expectations of relations, is not sufficient to ground a presumption of mental delusion; else many wills would be overthrown, and men's right to do as they please with their own would be greatly abridged. This right of disposition is one of the strong incentives to accumulate property, and to practise those virtues of industry and frugality which are essential to its accumulation. It is not to be lightly set aside. If the exercise of it contrary to family expectations, is to prove delusion of mind, then it don't exist—there is no such right. Every man, under pain of forfeiting his character for soundness of intellect, is compelled to dispose of his property,

not as he prefers, but as those would dictate who are called in this case, the "natural objects of his bounty." A man without parents, wife, or children, can scarcely be said to have natural objects of his bounty; and when he has been permitted to go through life attending to his own affairs, and taking good care of his estate, it is too late, after he has made his will and died, for collaterals to discover that for six or eight years his mind had been under a cloud, and that it passed into total eclipse just at the moment of their disappointment.

We see nothing in the case that was worthy of the jury's attention, except the condition of the testator at the time he performed the testamentary act. It is neither the case of continued delusion nor of undue influence, but it presents simply the question whether, when he made his will, he was what he described himself to be, " of sound and disposing mind, memory and understanding."

According to the first of the defendants' points, the jury were not at liberty to consider him in such a state, if " he had not a recollection of the property he meant to dispose of, of the persons who were the natural objects of his bounty, and the manner in which it was to be distributed between them."

By natural objects of his bounty, we suppose is meant those collaterals who, had he died intestate, would have been his heirs; but not heirs by any natural law, but only by the positive institutions of the state—and as the point is expressed, distribution among *them* is almost assumed as a necessary test of competency.

The doctrine of this point, like that of the second, which we have considered, would, if carried out, compel testators to give their estate to the same parties to whom the intestate laws would give it. They might perhaps alter the proportions of the distribution, but must not change the distributees. In other words, the old notion that if each child were not mentioned, though only to be cut off with a shilling, it was evidence of the testator's insanity, would be restored, and extended beyond its original limits, to collateral relatives—a failure to provide for whom by will, would be at least some evidence of incompetency.

Propositions that lead logically to such results, ought not to be admitted. The radical error of this first point is, that it assumes that the testator meant *distribution* of his estate, whereas the evidence, if it proved nothing else, established beyond a doubt that, after providing for his debts, his housekeeper, and his grave, he meant that his estate should go in a bulk to Grier.

The proofs show that his mind had been often exercised with the disposition of his estate, before his last sickness, sometimes contemplating one thing and sometimes another, but they show also that he had settled his purpose, definitely and finally, to give no part of it to his kindred. So firm was this purpose, that it

[Stevenson's Executor *v.* Stevenson *et al.*]

would not be shaken even by the remonstrances of his chosen friends, whom he had brought about his death-bed.

Now, if he had thus firmly determined to dispose of the body of the estate to a stranger, what necessity was he under to recall his property, piecemeal, to mind? And why should he be required to recollect his kindred? And, above all, why should an intention to distribute among *them* be assumed?

These tests become inapplicable, and therefore mischievous, in a case like this. Distribution was not the thing attempted, and therefore competency to distribute was not the proper test. In the exercise of his lawful dominion, the testator had determined to give his estate to a stranger. He expressed that determination in clear and unequivocal terms, and adhered to it with singular pertinacity. About this there can be no question, the proofs are so concurrent.

He may not have been able to specify every part of his property, or name every one of his kindred, but was he competent to form the resolution and purpose expressed in his will? That was the precise question to which the attention of the jury should have been singly directed, and says Swinburne, p. 78, "If some witnesses do depose, that the testator was of perfect mind and memory, and others depose the contrary, their testimony is to be preferred which depose that he was of sound memory; as well for that their testimony tendeth to the favour and validity of the testament, as for that the same is more agreeable to the disposition of nature, for every man is a creature reasonable."

This observation is especially applicable to a case where the subscribing witnesses and all who saw the testator the morning the will was made, concur in regard to his competency, and give reasons for their opinion that seem entitled to great weight. One very unusual circumstance occurred. The rumour of the will got afloat, and was met by an allegation of the testator's incompetency, which came to his ears before he died. His assertion of mental competency, in opposition to this rumoured defect, is not very important, for insane men generally account themselves sound; but the circumstance itself is important, as calculated to awaken the attention of witnesses, and induce more minute observations of his condition than would perhaps otherwise have been made.

We forbear from discussing the evidence in detail, because no question that is raised upon the record would make it proper. Having indicated the point to which it ought to have been addressed, it must go to another jury to say, whether the testator was competent to make the lawful disposition of his estate which is prescribed in his will.

The judgment is reversed, and a *venire facias de novo* is awarded.