# Leisey's Estate.

*Wills—Probate—Issue devisavit vel non—Fraud—Undue influence—Evidence—Knowledge of estate.*

1. A will is not invalid merely because it was made as the result of importunate solicitation; fraud, deceit, or such domination as subjugates the mind of a decedent possessing testamentary capacity, must be shown in order to defeat the will on the ground of undue influence.

2. In determining whether or not an issue devisavit vel non should be awarded, the evidence for as well as that against the will must be duly considered.

3. Where the draughtsman of a will, the subscribing witnesses, and the attending physician of the testator, all of whom have known him for some time, agree as to his capacity at the time of executing the will, strong evidence is required to impair the effect of their testimony.

4. If a testator designs to give the whole of his estate to a stranger, to the exclusion of his relations, it is not necessary that he should have a recollection of the property he intends to dispose of, or of the persons who are related to him. Distribution not being the thing attempted, a competency to distribute is not the test of his mental capacity.

5. Under such circumstances, it is only necessary that a testator should know and understand the character of the particular disposition he intends to make of his estate.

*Appeals—Assignments of error—Decree—Findings of fact.*

6. Where the final decree is alone assigned as error, the appellate court must accept the findings of fact as complete and accurate.

Argued April 28, 1924. Appeal, No. 167, Jan. T., 1924, by Samuel Leisey et al., children of decedent, from decree of O. C. Berks Co., File No. 8219, refusing an issue devisavit vel non, in estate of Samuel M. Leisey, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Certification of the record by register of wills under section 43 of the Act of June 7, 1917, P. L. 423. Before SCHAEFFER, P. J.

The opinion of the Supreme Court states the facts.

Issue devisavit vel non refused.

Samuel Leisey et al., children of deceased, appealed.

*Errors assigned* were ruling on evidence and decree, quoting them.

*Eugene D. Siegrist,* with him *H. Robert Mays,* for appellants.—The issue should have been awarded: Timmes' App., 237 Pa. 189; Robinson v. Robinson, 203 Pa. 400; Surface v. Bentz, 228 Pa. 610; Boyd v. Boyd, 66 Pa. 283; Phillips' Est., 244 Pa. 35; Adams' Est., 220 Pa. 531; Herster v. Herster, 122 Pa. 239.

*C. H. Ruhl,* with him *Wm. E. Fisher,* for appellee, cited: Caughey v. Bridenbaugh, 208 Pa. 414; Phillips' Est., 244 Pa. 35; McNitt v. Gilliland, 246 Pa. 378; Tetlow's Est., 269 Pa. 486; Goss's Est., 274 Pa. 278; Hopkins's Est., 277 Pa. 157.

OPINION BY MR. JUSTICE SIMPSON, May 27, 1924:

Testator died March 31, 1923, leaving a formal testamentary paper, executed on October 31, 1922, by which he gave his entire estate, valued at $5,041, "to my friend,

Lizzie R. Johns, who is waiting on me, and keeping and maintaining me." His three adult children, with whom he had not been living for a long time, and who did not help him during the closing hours of his life, when he needed it most, filed a caveat against the probate of that paper, alleging he was not of sound mind, and was unduly influenced, when he executed it. The orphans' court took testimony, dismissed the caveat, and directed the register to probate the paper; from this decree the three children have now appealed.

The assignments of error raise but two questions: (1) Was there error in refusing to admit evidence "that sometime in May, 1921, this decedent made a last will and testament in which he gave his property to his children?" and (2) Was there error in dismissing the caveat and directing the probate of the will? The reason given for rejecting the evidence, regarding the alleged prior will, was that it was too remote in point of time. It is not necessary to review this conclusion, however, since the result would be the same if it had been admitted.

None of the other actions of the court below are assigned as error, except the final decree refusing an issue; from this it necessarily follows that we must accept the findings of fact as complete and accurate. In order that we may properly understand appellant's contention that an issue should have been awarded, it is wise to first set forth, as we now do in the language of the trial judge, the situation and condition of testator about the time he executed his will:

"Decedent, who was about 76 years old, resided with [appellee] at the time of his death. His wife preceded him in death a few years, after which he lived in the Brethren Home near Lititz......and finally secured a home [with appellee] where he died. He was physically in a very wretched condition, helpless from the waist downwards, requiring assistance when necessary to be removed from the wheel chair in which he constantly sat; he was ruptured so badly that he could not attend

unassisted to his personal needs; and he was a great care to those who ministered to his wants and provided him with the many things which gave him comfort in his declining days. The Johns people [appellee and her husband] took him into their family, and treated him with kindness and nursed him patiently and faithfully."

With this background in view, we approach the consideration of appellant's evidence. So far as relates to the alleged incapacity, it is stated by the chancellor substantially as follows: Decedent's talk was not bright nor coherent; he talked from one thing to the other; he did not know what he was talking about; his mind was almost a blank; his conversation was not always intelligible; on one occasion he did not remember having lately seen his daughter, and on another the death of his granddaughter had passed out of his memory, although he had attended her funeral; he was profane and untidy; he talked foolishly about young women; he was unable to manage his estate or take care of himself; he wanted one witness to get a job for him when he was unable to leave his chair; he untruthfully said he had given each of his children $50,000 and had $50,000 left, although his estate was only $5,041; he became confused about roads; and, on one occasion, when in great pain and physical distress, he asked his nurse to take a revolver and shoot him.

None of the witnesses, who thus testified, saw decedent the day the will was executed, or shortly before or thereafter, and although, as is usual in such cases, they are free enough in their expression of opinion as to lack of memory, inattention to conversation, etc., etc., they give but few facts tending to bear out those opinions, and it is significant that the only one of those who saw decedent reasonably near the time the will was made, and who had the best opportunity of any of them to judge of his capacity, was his attorney in fact, who does not assert that decedent was so devoid of memory and understanding as to be unable to make a valid will.

No testimony was produced to sustain the charge of undue influence. Of course there was opportunity to solicit a testamentary gift, but there was no evidence this was suggested, much less than any undue influence was exerted. Even, importunate solicitation is permissible (Englert v. Englert, 198 Pa. 326); it is only when fraud, deceit or such domination as subjugates the mind of a decedent, is shown, that undue influence can be said to appear: Herster v. Herster, 122 Pa. 239, 252. Here no such proof was offered. It is true proponent's husband told the scrivener of the will that decedent wanted to see him, but the husband did not know the reason for that desire, no time was fixed for the call, and the scrivener came when it suited himself, without notice to anybody. It is also true that appellee was in and out of the room when the will was drawn and executed, but everything was done privately, and she could not have known its contents. So far as appears, she was not advised with, either then or at any other time, in regard to decedent's property or what he intended to do with it, and she had no dealings with him except such as arose out of the relation of landlady and boarder. There was, therefore, no confidential relation shown to exist between them, and hence no presumption of undue influence could arise by reason of the testamentary gift to her.

The pitiable showing outlined above, proves that the chancellor was not lightly weighing contestants' case, when he said he did not think that their testimony, if " 'looked at separately,' would support a verdict against the will." We are clear it would not; but when it is viewed as a whole, the evidence for as well as that against the will, as must be done (Fleming's Est., 265 Pa. 399), all possibility of an adverse verdict is swept aside. We shall limit our review of proponent's case to stating, in the language of the chancellor, the testimony of the scrivener, the other subscribing witness and the attending physician; because, where, as here, their testimony

is clear and undisputed, and they have known testator for some time, it would take far stronger evidence than appears on this record, in order to overcome it: Kane's Est., 206 Pa. 204; Kustus v. Hager, 269 Pa. 103.

"Jonathan Swope, the scrivener of the will, a justice of the peace for 37 years, and one of the best known residents of the section of the county where these parties reside, testified with great particularity as to the circumstances surrounding the execution of the alleged will. He stated that he went to see decedent at Johns' house in response to a request of Mr. Johns, who told him that decedent desired to see him; that he did not know what decedent wanted him to do until he arrived at the house, where he found him sitting in a wheel-chair in the kitchen, which was very large and apparently the living-room of the Johns, who were farmers; that he then asked decedent what he could do for him, and, after talking with him for some time at the far end of the room and 'privately,' decedent told the squire that the Johns family were very kind to him and were taking good care of him, and that he wanted to give all his property to Mrs. Johns. After receiving these instructions from decedent, the squire prepared the writing, read it and explained it to decedent, after which he signed it in the presence of the squire and declared it as his will in the presence of Adam Brown, the other subscribing witness, who was called in after decedent had executed it. The squire said he had known decedent for at least thirty years, that he noticed no change in mentality when the writing was executed, that his conversation was rational, and that he comprehended the meaning of the act he was engaged in. The squire also testified that he did not tell Mrs. Johns, or anyone, what the will contained, and that after it was prepared and executed, at the direction of decedent, he took it along and kept it in his safe until the death of Mr. Leisey.

"The other subscribing witness, Adam K. Brown, who knew decedent for about twenty years and visited him

three or four times a week while he was living in the Johns family, said he signed his name as a witness to the writing at the request of Mr. Leisey, who told him it was a will, and that Leisey's 'mind was all right.' Brown, who was a neighbor of the Johns family, detailed when and how he had visited decedent, and, on the day when the writing was executed, how he had seen him about one hour before and had talked with him about hunting and fishing, at which time, he said, his conversation had been coherent and intelligible.

"Both subscribing witnesses, therefore, who had known the decedent for years, testified that he was mentally all right and that he understood full well what he was doing when he made the writing......

"The proponent also submitted the testimony of Dr. H. S. Gingrich, the attending physician of decedent, who had visited him at least thirteen times and who said that while decedent was a physical wreck, he was, nevertheless, mentally sound and 'rational in every respect.'"

Appellants seem to think this mass of sustaining testimony is of little or no moment because the scrivener, and the other subscribing witness, did not hear testator speak of his family or property at the time the will was drawn and executed. But why should he have spoken of either? "If a testator designs to give the whole of his estate to a stranger, to the exclusion of his......relations, it is not necessary that he should have a recollection of the property he intends to dispose of, or of the persons who are thus related to him. Distribution not being the thing attempted, a competency to distribute is not the test of mental capacity": Stevenson v. Stevenson, 33 Pa. 469. What he was doing was probably one of the simplest things of even his plain and unobtrusive life, and hence the only applicable test was: Did he know and understand the business in which he was engaged at the time he executed this easily understood gift to the person who had been and was being kind and helpful to him in his hour of need? Wilson v. Mitchell, 101 Pa. 495.

We have no doubt he fully understood all he did, that it was natural gratitude, and not undue influence, which caused the gift, and that no chancellor would be justified in allowing a jury to decide otherwise.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellants.