Argued October 9, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Charles Alvin Jones,* with him *Sterrett & Acheson, Thomas Nichols* and *Miller & Nesbitt,* for appellants.— Under the facts, either proved, admitted or undenied by the proponents, a presumption of undue influence

arises therefrom against them, which it is their legal duty to rebut, whereby the case is one proper for the jury: Boyd v. Boyd, 66 Pa. 283; Wagner's Est., 289 Pa. 361; Wolfe's Est., 284 Pa. 169; Gongaware v. Donehoo, 255 Pa. 502; Phillips's Est., 244 Pa. 35; Adams's Est., 220 Pa. 531; Douglass's Est., 162 Pa. 567; Darlington's Est., 147 Pa. 624; Yardley v. Cuthbertson, 108 Pa. 395; Caldwell v. Anderson, 104 Pa. 199; Cuthertson's App., 97 Pa. 163.

*O. K. Eaton,* with him *Walter L. Riggs,* for appellee.

OPINION BY MR. JUSTICE FRAZER, November 25, 1929:

Annie S. Mark, a widow, died December 19, 1927, aged fifty-eight years, leaving a will bearing date December 2, 1927, which was duly probated. An appeal from the decision of the register of wills, admitting the instrument to probate, was filed by heirs at law and next of kin, alleging want of testamentary capacity and undue influence, and asking that an issue d. v. n. be awarded. The court below refused the issue and this appeal followed.

It is admitted by counsel for contestants that "In so far as the learned court below found facts, the appellants have little complaint therewith" and "although several of such findings are in direct conflict with the only record evidence" they "are relatively unimportant." We may therefore, as we said in Doster's Estate, 271 Pa. 68, 72, adhere to the rule laid down by this court in Tetlow's Estate, 269 Pa. 486, which, concretely expressed, is that there must be an abuse of discretion by the hearing judge sitting as a chancellor when an issue is refused, before this court will reverse. It is his duty, after weighing the evidence impartially, to refuse to present the question to a jury, unless he feels the ends of justice call for a verdict against the will, or he is so uncertain on this point that he could conscionably sustain a finding either way on one or more of the control-

ling issues involved. The material facts here being admittedly established, we have weighed the evidence in the case from the standpoint of whether or not it is sufficient to sustain the judgment of the court below to the effect that Mrs. Mark possessed testamentary capacity, was not unduly influenced in making her will and that the will in controversy was a valid instrument. Our thorough examination of this very large record satisfies us the judgment should not be disturbed.

Mrs. Mark, at the time she executed her will on December 2, 1927, was not an aged woman. Her husband had died in 1926; they had no children and her nearest relatives were the contestants here. She had many warm friends, was attentive in her church devotions and was an active member of an auxiliary of the American-Spanish War Veterans, served on committees of that organization and shared in its other activities.

The evidence discloses that decedent made three wills after the death of her husband in November, 1926, one dated January 4, 1927, which was not executed; another, properly signed by her and attested by witnesses, which she destroyed about December 2, 1927; and the third, dated December 2, 1927, fully executed and the one here in controversy. The unsigned and the destroyed papers have merely an incidental connection with this litigation. The question consequently is, Was the will of December 2, 1927, admitted to probate, a valid instrument?

We are met with the contention, first, that Mrs. Mark did not possess testamentary capacity at the time she executed this last mentioned paper at the residence of Mr. and Mrs. Hendy Keil, in the city of McKeesport, where she was then making her home and where she died December 30, 1927, twenty-eight days after execution of the will in dispute. Our careful examination of the more than 600 pages of testimony convinces us that while, as the lower court found, Mrs. Mark was to a considerable extent physically weakened by illness, such

bodily debility did not at all incapacitate her from performing the legal functions required in executing the testamentary paper and seeing it properly attested by witnesses; and also there was no mental impairment and consequently no decline originated from her weakened physical condition or was a concomitant of that weakness. Contrary to the argument of appellants' counsel, Armor's Estate, 154 Pa. 517, which they cite, is not applicable here. In that case decedent at her death was a person of extreme old age, having reached her ninety-third year. There was evidence, particularly by the family physician, tending to show imbecility and the court below was of opinion there existed sufficient evidence of testamentary incapacity to require that question to be passed upon by a jury, but found the proof of undue influence was insufficient to justify an issue, and on that ground refused the issue. This court reversed the case and said (page 522) : "It is urged that this assumption by Butts of control over the mind and property of his aged and infirm mother-in-law, her childish submission to the usurpation, is evidence both of testamentary incapacity and undue influence, and the conclusion drawn from the evidence necessarily points with as much probability to the one as to the other."

The facts in the case now before us are quite different. Testatrix was fifty-eight years old at the time she died and, so far as the record discloses, in good health until attacked by her last complicated illness of heart and nerve troubles and diabetes. Undoubtedly she was a woman of strong mind, she had many friends and was held in great esteem by them. She was prone to pronounced prejudices and personal antipathies, like many other mortals; had an affectionate regard for those who pleased her and strong dislikes towards those whom she believed had offended her. The evidence discloses an illuminating instance of these characteristics. In her unsigned will, she had appointed Ed. Kemp, an acquaint-

ance of many years standing, one of her executors and had named him and his wife as beneficiaries. In her final will their names do not appear, for the reason that during her last illness she heard Kemp suggest that she be taken to a hospital. She had a horror of such institutions, having been at one time a patient in one for the purpose of having her tonsils removed, and was so deeply offended by Kemp's suggestion, that she left him a rather bitterly worded letter, explaining her change of mind, in which she said: "And in the end when I got down and had to look to my friends to care for me you my best friend wanted to cart me to a hospital." She considered contestants and other relatives had been neglectful of her and resented that attitude, which may or may not have been justified. We can not however hold these antipathies, standing alone, to be evidences of a disordered mind, nor do they imply an impaired mentality (Stevenson v. Stevenson, 33 Pa. 469; McGovran's Estate, 185 Pa. 203), and, as the court below said: "Whether she was justified in this critical attitude we need not inquire. She had a right to indulge her prejudices if she wished without being adjudged of unsound mind."

The court below notes in careful detail the evidence produced by appellants to support their claim that decedent was mentally enfeebled and without testamentary capacity, and with equal care he has set forth the evidence of proponents, showing the reverse. We have gone over the same, and, giving to appellants' evidence all weight and credibility fairly due it, we are free to say that it does not furnish sufficient or convincing proof of weakened intellectual faculties. Her superintendence of her financial and property affairs was always careful and vigorous and that vigilance did not lessen during her illness. In her last will, containing forty legacies, which she dictated wholly from memory, she details minutely the matters pertaining to her real estate, the section and number of her cemetery lot, her various

bank accounts, the amounts she had on deposit and the terms governing the interest on her savings accounts; she sets forth correctly facts regarding her shares of stocks and mortgages, giving the dates and terms, and the number of her safe deposit box in the bank.

The court below found there was not sufficient evidence to support the charge that decedent was unduly influenced in making her will and might have fairly gone further and said practically no evidence to that effect was produced. Certainly, there was ample proof to sustain his conclusion. Where the charge is that undue influence was exerted on a mind healthy, strong and free, the proof must be clear and convincing: Caughey v. Bridenbaugh, 208 Pa. 414; Logan's Estate, 195 Pa. 282. We may summarize here some of the salient features of the evidence. After the death of her husband in 1926, testatrix lived alone in her large residence. Becoming weary of this existence, she finally, upon her own suggestion and initiative, decided to make her home with the Keil family, she and Mrs. Keil having been intimate friends for forty years. Established there, she decided to make it her permanent residence, and at once displayed her natural assertiveness of mind. She planned and determined upon material and expensive improvements for her own convenience in the interior of the Keil residence, she to defray the cost. A fire occurring near by, she decided the Keil house should have a new roof more impervious to sparks, and gave her hosts $500 for that purpose. Subsequent to executing her will she learned there was a mortgage of $5,000 on the Keil home. Christmas was approaching, and calling Mr. and Mrs. Keil to her bedside, she said to them that she realized her presence as a sick person in their home would make a "sad Christmas" for them, but that she would make it "one of the pleasantest," as she intended "to pay off the mortgage on [their] home and take that worry off." She gave them a check for $5,500, the $500 to be used for the new roof. There is no evidence what-

ever to show the Keils, by request or even intimation, or suggestion originated the performance of this generous act. The evidence is plain that testatrix appreciated the attention and kindness of the Keils, and this fact was further emphasized by presenting on that same Christmas, articles of jewelry to Mrs. Keil. Decedent felt herself estranged from her relatives, she seems to have believed she would not recover from her illness and of course could dispose of her property to whom she pleased. Her deeds of generosity were voluntary, as the evidence indicates, and it shows plainly enough that instead of the Keil family having any domination over her, it was she who dominated them. Her friends were free to come and see her during her illness, except at times when her physician ordered that her weakened physical condition required rest and quiet. This rule however was broken more than once by Mrs. Keil admitting visiting friends to see her at forbidden periods.

As for Dr. Chambers, her regular physician, who is charged, with the Keils, as having exercised undue influence over decedent and being instrumental in inducing her to make the will she did, and in which he is named as an executor and a beneficiary to the extent of about $2,500, the court below found that the evidence to that effect "is meagre and far short of convincing." He was the Keil family physician; Mrs. Mark had previously refused to accept the services of two other doctors, one, because she did not like him, and the second, who had been her family physician at the time her husband died and had not called to see her since. She, however, desired the services of a doctor when she became ill at the Keil residence, and having refused to call either of the two mentioned above, she said to Mrs. Keil: "If you have a doctor here that you know is all right and won't send me to the hospital and will tell me just what is wrong with me, then you call him." In response to this instruction, Dr. Chambers was called, and proved satisfactory to Mrs. Mark's exacting mind. There is no evi-

dence that he at any time endeavored to ingratiate himself mercenarily into her good will; she appreciated his services and on Christmas presented him with a stick pin which her father had worn, because the doctor resembled her father in appearance. Previous to making her will she had asked him to be one of her executors and he had consented.

Counsel for appellants refer in their printed brief to "the setting arranged for the execution of the will." The phrase is not incorrectly used. It was a proceeding quite effectively "arranged"; but it was a special and personal arrangement by testatrix herself; and this transaction alone is a striking illustration of her soundness and alertness of mind, her appreciation of the necessity of observing the legal requirements governing the execution of a will and the evident insistence that her predetermined disposition of her estate should be ultimately made as she intended. Consequently, with marked intelligence and clearness of purpose, she arranged and directed the execution of the will. Two days before, she sent for an old friend to draft the paper; that person was however unable to be present. She then peremptorily told Keil she wanted him to prepare the paper, and for an hour dictated to him the details, which he copied on a typewriter the same day and brought to her the finished paper; this she placed under her pillow, and subsequently read. The next evening the will was signed in the manner she had fixed upon. She called in two of her friends to be witnesses, and with them in her room were the Keils and Dr. Chambers, all present at her request. The attesting witnesses are not beneficiaries under the will, and their testimony, as well as that of the others present, varies immaterially. One of the witnesses, Shaffer, testified as follows: "We went into the room and Mrs. Mark spoke to us, said, 'Good evening,' and we spoke to her and for a second stood just inside of the door. Mrs. Mark said: 'Mr. Shaffer, you go to the right hand, and, Mr. Woodford, you stand

on the left-hand side, so that you will be able to see everything that is going on'; and, after we were located, Mrs. Mark said: 'Gentlemen, I have called you this evening to have you witness my last will and testament'; she said 'I don't suppose there is any doubt in your mind of my being able to make a will,' and I laughed and said, 'No, there doesn't look to be to me'; and she signed the will." The paper, as it shows, was properly signed by the two witnesses. While this proceeding was going on testatrix sat up in bed, with pillows at her back. The court below found no reason not to give full credibility to the five witnesses who took part in the execution of the paper, and we see no reason to reach a contrary conclusion. It would, we think, be an extraordinary and unheard of achievement of cunning to have this scene of the signing of a will successfully carried through, with a person decrepit in body and broken down in mind obeying the directions of designing persons. Nothing in the record permits the presumption, much less the conclusion, that this strong minded woman, although weakened by sickness and unable to leave her bed, would have permitted at any time a restraint upon her free action as the disposer of her own property, and, as we understand her character from the light of the evidence, any effort of that sort on the part of beneficiaries under her will would have at once put them beyond the pale of her friendship and her generosity. It is only where the testator is of weak mind, arising from physical or mental ailment that a presumption of undue influence arises when a stranger to his blood procures a large legacy: Llewellyn's Estate, 296 Pa. 74.

The decree of the court below is affirmed. Costs to be paid by appellants.