Union Trust Company of New Castle, Appellant, *v.* Cwynar.

Argued March 28, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Robert M. White, II,* and *Gilbert E. Long,* for appellants.

*Sherman K. Levine,* for appellee.

Opinion by Mr. Justice Musmanno, April 26, 1957:

John C. McMillin, who is the pivotal figure in this litigation, was a professional druggist with a pharmacy of his own in a community called Mahoningtown, located in the city of New Castle, Lawrence County. In the year 1947, having reached the age of 75, he decided to retire and he accordingly sold his pharmacy business to two men, Glynn Thomas and Fred J. Shaffer, retaining however, the ownership of the building. On September 1, 1950, Thomas and Shaffer sold the business to Helen J. Cwynar, a young woman then 22 years of age who had been working in the drug store. On the same day that she purchased the stock and good will of the establishment, she entered into a lease with John C. McMillin for rental of the store building at $50 per month.

Mr. McMillin's wife had died in 1948, and since the climate of affection between himself and his relatives (3 sisters and a niece) was slightly arctic, he experienced many lonely hours, to combat which he often visited his former drug store to fill prescriptions for old customers of his. Here he found Miss Cwynar's presence to be a most pleasant and agreeable one, and they became friends. Although the years had not affected the clarity of the pharmacist's mind, they had saddled upon him some infirmities which handicapped him in attending to his business affairs, which were complicated by reason of his ownership not only of the drug store building but of two apartment houses and a private dwelling house in New Castle, plus 74 acres of land with two houses thereon in North Beaver Township. In a spirit of helpfulness, Miss Cwynar offered to perform errands for him and to drive him in her car when he needed transportation. In 1953, the aging apothecary's driver's license was revoked and she then became his regular driver. Depending increasingly on

her services he now commissioned her to collect rents for him from his properties in Mahoningtown, and for this helping hand he paid her $60 per month.

In March, 1953, Miss Cwynar learned that McMillin wished to dispose of some of his property and she offered to purchase the building which housed her drug store. Not averse to the idea, and pleased for an opportunity to show his further gratitude for her assistance and friendship, he set a price of only $5,000 on the building although it was admittedly worth $17,000. The difference in $12,000 represented benevolence founded on sentiment, for McMillin had now become quite attached to this young woman who, according to all accounts, was attractive in appearance and manner. Not only did McMillin voluntarily accept a loss in the transaction but he counselled and guided Miss Cwynar as to how she could borrow the money with which to purchase the building, since she was wholly lacking in financial resources.

Prior to buying the drug store, Miss Cwynar paid her rent directly to her landlord at his home. These visits to his living quarters increased in number when she became his agent for the collection of rents paid by others. Her frequent appearances consoled his widower's loneliness and supplied warmth of feeling to take the place of the coolness in his heart for his own relatives. In time his sentiment toward her ripened into love. At any rate, whatever may have been the emotion which led him to the event, the now 80-year old ex-pharmacist offered marriage to Miss Cwynar who, astonished at the proposal, let him down easily by promising to continue their friendly relationship. She did, however, at his insistence, take the diamond ring which had been worn by his deceased wife. Later on Miss Cwynar married a man by the name of Tommelleo, but even this important change in her life, sta-

648

tus, and routine, did not lessen McMillin's regard for her.

On his visits to her drug store it grieved him to see many shelves in his old place of business staring emptily into space because of lack of stock with which to fill them. A nostalgic pride, added to his never-failing wish to help the new proprietor, urged him into spending money to fill the shelves with medicines and pharmaceutical accessories consonant with the nature and the demands of the business. These donations, plus what he gave her as outright gifts, amounted in all to the total of $3636.

His infirmities, however, continued and augmented and as he entered into the shadows of his 83rd year, the Court of Common Pleas of Lawrence County, on February 25, 1955, declared him incompetent to manage his business affairs and appointed the Union Trust Company of New Castle as guardian of his estate.* On May 25, 1955, the guardian filed a complaint in equity against Helen Cwynar, alleging that she stood in a confidential relationship to McMillin and that she exercised undue influence over him to his disadvantage. It was prayed that she be compelled to reconvey the drug store building, restore the diamond ring, and pay back all moneys received for which she had not rendered full and complete value. McMillin's sisters Martha McClurg and Matilda Miller, his niece Eleanor E. Cox, and his nephew Edward McMillin, were joined as intervenors, and the cause came on for a hearing before a chancellor who on December 17, 1955, found that Helen Cwynar enjoyed a confidential relationship with McMillin of which she took advantage, and he accordingly ordered her to reconvey the drug store

* John C. McMillin died testate on August 22, 1956, and letters of administration were granted to the Union Trust Company, former guardian of his estate.

property, pay back the $3636, and restore the diamond ring. The defendant filed exceptions to the adjudication and this Court, because of the chance circumstance that the chancellor's term of office had expired, and the other judges of Lawrence County had disqualified themselves in the matter, assigned President Judge ROBERT E. McCREARY of Beaver County and Judge LEO H. McKAY of Mercer County to sit as a court en banc to hear arguments and act on the exceptions. On October 16, 1956, the court en banc reversed the chancellor's decree and entered judgment in favor of the defendant, holding that no confidential relationship existed between her and McMillin and no undue influence had been practised by her upon him. The plaintiffs appealed to this Court.

We have read the record which is a long one, consisting of 751 printed pages, and we are satisfied that the specially appointed court en banc was entirely justified in reaching the conclusions announced. While a court en banc and appellate tribunals are bound by the findings of a chancellor, if they are supported by competent and adequate evidence, the reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. (*Barrett v. Heiner,* 367 Pa. 510; *Eways v. Reading Parking Authority,* 385 Pa. 592.)

The question to be answered by the record is: Did Helen Cwynar stand in a confidential relationship to McMillin, and, if so, did she prove that the transactions with him which resulted to her benefit and advantage were in all respects fair and just and that the gifts made by McMillin to her were his own free and voluntary acts? (*McCown v. Fraser,* 327 Pa. 561.)

The appellants argue that Miss Cwynar was an adventuress who misled an old man and despoiled him of his property unconscionably and wickedly. At the

time of the drug store building transaction McMillin was 81 years of age and Helen Cwynar, 25. In their brief, appellants' counsel refer to Miss Cwynar as "avaricious," "scheming," and "designing." And then, after this adjectival delineation they assert that she "cultivated his [McMillin's] unnatural susceptibility for charms of young women," and "wormed her way into the affection and confidence of this man," who, under similar adjectival treatment becomes "senile," and "mentally deteriorated," and falls "victim of a cruel fraud." It is a picture easily drawn, but it is a picture whose lines dim as we read the record and whose image completely disappears when held in the daylight of scrutinizing judgment. The most innocent act may seem sinister if it is looked at in the flickering lights and shadows of an inordinate suspicion just as an innocuous chair over which clothes have been haphazardly flung takes on the grotesqueness of an ominous menace to the frightened eyes of a suddenly awakened child.

For instance, the appellants invest Helen Cwynar's visit to McMillin's living quarters with sensual overtones, stating that she went to "his apartment both day and night, even midnight." But the record only shows that Miss Cwynar visited McMillin's apartment "several times a week," and "usually in the daytime." The testimony which is supposed to warrant the statement that Miss Cwynar had midnight trysts with McMillin was given by Mrs. Ulam, a housekeeper in the same apartment house, and it reads as follows: "Q. Did you ever see Helen Cwynar down there? A. Yes. Q. That was while you were living there? A. That's right. Q. How often did you see her there? A. Not too often because I was always in the back, back of the apartments there but I saw her pretty often, *not too often, not every day.* Q. Any more than once a week? A. Yes.

Q. When would she ordinarily call with respect to the day or night? A. Mostly days, I wasn't there at night. I didn't live in there." (Emphasis supplied.) Moreover, Miss Cwynar's visits were often made, as already stated, for the purpose of delivering the rent money she collected on McMillin's houses.

In 1949 McMillin was hospitalized for three weeks, and was there attended by a nurse, Miss Micco. After his discharge from the hospital the nurse called at his apartment once a week to administer medication. In a strenuous effort to depict McMillin as an over-vigorous cavalier and roué, appellants' counsel say that "Mr. McMillin showered her with flowers and candy to the point of embarrassment." A study of the record reveals that the "shower" was so sparse as actually to amount to a drought. Miss Micco testified that he gave her flowers "more than *once,*" and there is no evidence that he ever sweetened her life with candy. Nevertheless, no matter how Miss Micco may have felt about McMillin's gift of flowers "more than once." she was satisfied, and so testified in answer to a question by the Court, that mentally McMillin "seemed clear."

Typical of the exaggeration indulged in by the appellants, it is stated that Mrs. Reddick was a "housekeeper in the McMillin household," to whom McMillin "paid $25.00 per week for twenty-four hour service." Mrs. Reddick was a married woman and lived with her husband so that she could scarcely give McMillin daily "twenty-four hour service." Moreover, she was not a housekeeper but a tenant in the same apartment house (paying $15 per week for her apartment) who helped McMillin in the collection of rents accruing on properties which belonged to Mrs. McMillin, now deceased.

It is unquestioned that McMillin entertained romantic notions toward Helen Cwynar and would have liked to marry her, but the sole evidence advanced by the

appellants to support their statement that he was preparing for a wedding, was that he purchased a suit in which to get married. The only testimony in the record on this supposed pre-nuptial preparation was that Mrs. Ulam picked up a suit for McMillin which he had selected. It was not a full dress suit or a tuxedo. It was simply a suit—one in which McMillin could have been buried in, as well as married in. The overall indictment of "mental deterioration" charged to McMillin (as of the date of the transfer of the property and gifts to Miss Cwynar) consists of a number of trivialities such as those recounted. Not one of those incidents establishes any mental deterioration, and the aggregate total is no stronger than the least of the inconsequentialities related. Certainly it was not proved that McMillin was in any way dominated by Helen Cwynar.

There is no photograph of Helen Cwynar in the record, but the chancellor called her a "pretty woman," and no one has questioned his finding in this respect. But feminine pulchritude, as appealing as it is, cannot of itself be legally accepted as synonymous with undue influence. Furthermore, before considering the subject of undue influence in this case there would need to be a finding of confidential relationship. Confidential relationship has been variously defined. In the case of *Wilson Will*, 364 Pa. 488, 493, this Court said: "A confidential relation exists whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence, over the other".

In *McCown v. Fraser*, 327 Pa. 561, 565, we said of confidential relationship: "In general it may be said that a confidential relation will be deemed to exist whenever the relative position of the parties is such that the one has power and means to take advantage

of, or exercise undue influence over the other . . . In such case the party in the superior position is obligated, legally as well as morally, to act with the most scrupulous fairness and good faith, and to refrain from using the trust and confidence reposed in him to secure an advantage for himself . . ."

A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally—with the opportunity to use that superiority to the other's disadvantage. Miss Cwynar's relationship to McMillin was not a confidential one. It was one of friendship which had its genesis in a business association. She was in no way related to her benefactor and she did not live with him. Her social contacts with him were sporadic and followed no woven pattern of growing intimacy. She was kind to him, but kind acts do not spell out confidential relationship. Nor is there anything in the record to prove that even if a confidential relationship existed that Miss Cwynar unduly influenced McMillin against the natural objects of his bounty. There is no evidence that Miss Cwynar in any way ever endeavored to persuade McMillin against his relatives. His cup of dislike for them apparently was already overflowing before he even met Miss Cwynar.

Much of McMillin's antipathy toward his living kin was predicated on a belief, justified or not, that they had been ungracious to his wife during her lifetime. He also complained that they never visited him and declared that they were only interested in his money. He thus announced repetitiously that although he had made many gifts to them he purposed to give away all his remaining property so that nothing would be left for them to inherit.

Every person has the right and privilege to dispose of his property. As man nears the end of his journey, one of his compensations for the sadness of parting from his travelling companions is the realization that he can do whatever he wishes with his earthly possessions, short of taking them with him. Thus, he can bestow part or all of them on that person or persons who at that moment are dearest to his heart, so long as his act is uncoerced. And there is nothing in the law which prohibits him, once his estate meets all statutory requirements, from giving his worldly wealth to that person who brought a cup of water to his parched affections and a slice of bread to his hunger for love.

That McMillin preferred Miss Cwynar to his relatives is not a matter for juridicial consideration. Nor was his antipathy to his kin any indication of a disordered mind as contended for by the appellants. In *Mark's Estate*, 298 Pa. 285, it was argued that the testatrix's estrangement from her relatives, plus physical illness, was evidence of mental incapacity, but this Court said: "We can not however hold these antipathies, standing alone, to be evidences of a disordered mind, nor do they imply an impaired mentality (Stevenson v. Stevenson, 33 Pa. 469; McGovran's Estate, 185 Pa. 203), and, as the court below said: 'Whether she was justified in this critical attitude we need not inquire. She had a right to indulge her prejudices if she wished without being adjudged of unsound mind."

As we have heretofore indicated, McMillin's health felt the weight of declining years. He suffered from hardening of the arteries and an impaired heart. He was short of breath and sometimes of temper. In 1949 he underwent a major operation, following which a cane was as inseparable as his shadow. Notwithstanding these ailments and occasional lapses in mem-

ory, as stated by the court en banc below, "he knew his property, was able to list it and look after it in all routine ways, he wrote checks, borrowed some money on mortgage, and made contracts for improvement of his farm. He knew the names and identity of his relatives."

What was said by this Court in *Jones v. Schaefer,* 357 Pa. 628, 637, could well apply to the fact-situation here: "This Court will not lay down a rule that because an individual is between 82 and 83 years of age and is recovering from a physical illness, any act of his at that time in executing a legal document disposing of his property will be treated as a nullity. Other than the fact of William H. Jones' age and the fact that he was suffering from a 'kidney disturbance' and from an 'enlargement of one of the glands of his body,' and from 'generalized arteriosclerosis', he was in a legal sense, as capable of transacting business at the time he executed the documents in question as any other man would have been. The facts cited did not so reduce his mental capacity to transact business as to justify a court's deciding that his acts at the time can be given no legal effect. This court has frequently in its decisions manifested its respect for the integrity of written instruments, and such instruments are not to be set aside except upon convincing testimony that their execution was tainted with fraud, either actual or constructive, or that the person so executing them did not have what the law considers sufficient mental capacity to do so."

The main attack on McMillin's capacity to dispose of his property is concentrated on his 81st year when he deeded the drug store property to Miss Cwynar. Yet, one year later when he executed two wills, a power of attorney, and a mortgage, the attorneys and bankers who observed him did not question his mental ca-

pacity. Dr. R. G. Campbell, who examined McMillin in September, 1954, testified: "Q. Did you conduct an examination of Mr. McMillin? A. Yes, sir. Q. What was the nature of your examination? A. I did a mental exam on him. . . . Q. At the time that you examined him do you have an opinion as to whether or not Mr. John C. McMillin was competent to write a will on that date? A. I judge he was. Q. Were you one of the subscribing witnesses, Doctor? A. Yes, sir. Q. Was there anything unusual about the mental alertness of John C. McMillin compared to any other person of that age? A. No, sir. He was very normal the day I examined him."

It is clear that Helen Cwynar did not stand in a confidential relationship to McMillin. However, in studying the record, we note that even if there had been confidential relationship established between these two persons, the defendant met the burden of proving that McMillin's gifts to her were the result of his free and intentional acts, and, therefore, the judgment of the Court below is affirmed.

Costs to be paid out of the estate.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

I would sustain the findings of fact and the conclusions of the chancellor, who saw and heard the witnesses, to wit, Helen Cwynar, aged 25, whom he described as an attractive scheming girl, occupied a confidential relationship and exercised undue influence on a *weak-minded* senile, "lovesick" 81 year old man and thereby *systemically denuded* him in one year of one-third of his property. Cf. *McCown v. Fraser*, 327 Pa. 561, 192 A. 674. McMillin did not lack testamentary capacity, but I agree that he was in such a weak-

ened mental condition as to be an easy prey for designing persons who might want to secure his property. The chancellor who, I repeat, saw and heard the witnesses, found, inter alia, as follows:

"In the case at bar it is clear on the side of Helen Cwynar Tommelleo there was overmastering influence over Mr. McMillin. Gradually she took over control of his life. She entertained him for hours at a time at his old store, then hers. She took every opportunity to visit him where he sat immobilized in the clutter of his widower's apartment. He fell in love with her. She took over the collection of his Mahoningtown rents, the management of the repairs of his farm property, the collection of his Neshannock Avenue rents, the management of that property, his automobile and his means of getting about. She encouraged his alienation from his family.

"Mr. McMillin told Holland Shaffer at the farm to do anything with reference to the repairs which defendant told him to do *and he told Mrs. Dorothy Rogers, his housekeeper, that she would have to do what defendant said or get out.** The defendant told Mrs. Mary Quorto Ticconi that Mr. McMillin liked her so much that he would do anything for her and she told Mrs. Ticconi how much in the way of repairs she was putting on the farm place. *Defendant testified* in court that 'for a period of years *I had been doing just about everything for Mr. McMillin*'. After Attorney Solomon remonstrated with Mr. McMillin about his improvident sale to defendant, she in tears caused the old man to call up Mr. Solomon and denounce him for it. While the deal for the drug store property was pending Mr. McMillin kept asking Attorney Lyons not

---

* Italics throughout, ours.

when he could get his money but when Helen could get her money.

"...

"The present inquiry relates to 1953. . . . April 17, 1953 was the date of the deed and the $3636 was given to defendant later that year. What was his condition then?

"For this period we have the valuable opinions of two people who had ample opportunity to observe Mr. McMillin trying to manage his own affairs. They were Alvah M. Shumaker who was his lawyer and Mr. Holland Shaffer who was remodeling his farmhouse. Each expressed the opinion that Mr. McMillin was so weakened mentally that he was apt to become the victim of designing persons.

"Mr. Shumaker's opinion was based upon his observations during a period of about two years during which he acted as Mr. McMillin's lawyer, only to find himself displaced in 1953 when the deed to defendant was made by defendant's lawyer and in 1954 when the careful plan to have Mr. McMillin's property handled by a bank as attorney in fact was set aside, as I have found, through defendant's influence over the old man.

"Mr. Shaffer's opinion was well founded. He observed Mr. McMillin's inability to understand his own finances, heard the old man's baseless complaint that $8000 had been stolen from him, was offered $15 in payment of a bill for $1900 then due, was later offered the gift of a note signed by McMillin with the amount blank and observed him turn the management of the remodeling over to defendant.

"Three women who served periods as housekeeper at the McMillin apartments on Neshannock Avenue are important witnesses, all shrewd and honest women. Mrs. Helen Reddick began work in 1947 while Mrs. McMillin was still living and continued until 1950.

She observed his helplessness when confronted with the task of taking over his wife's property. Mrs. Helen Rogers served from July 1952 to October 1953. She testified as to Mr. McMillin's *confusion* about his rents and his erratic and irrational conduct toward his tenants. Mrs. Caroline A. Ulam who worked for Mr. McMillin from April 1954 until the appointment of the guardian in 1955 testified concerning the 'crazy' things he did to his tenants, compelling tenants whose rent was paid up to move, nailing up doors against tenants whom he did not like and performing similar irrational acts."

The chancellor also found that McMillin was *completely confused* as to the spurious *sale and conveyance of his drugstore* property and did not know how much was due him or when the payment was to be made and "was *equally confused* as to the payment to defendant of the sum of $3636". "Mr. McMillin made three statements to show that he still had money coming to him after he had given defendant a deed for the drug store property; one to Mr. Shumaker, one to Mr. Lyon, and one to the court at the time of the guardianship. Admittedly these declarations would not be competent to set aside a written instrument. . . . There is direct evidence that Mr. McMillin was to receive more money for the property than he got. *Helen Cwynar stated* to the bank both orally and in writing that *the purchase price was not $5000, but $15,000.* In view of this fact the importance of Mr. McMillin's declarations is at once apparent. The old man was too old, too weak, too susceptible to know precisely what was going on and to protect himself. . . . Mr. McMillin told several people that he expected to marry defendant. She told Holland Shaffer that she could have the farm by marrying the old man. He gave and she received his wife's diamond ring.

"McCown et al. v. Fraser et al., 327 Pa. 561 is a case exactly in point. There the victim was an old [strong-minded and brilliant] woman who became enamored of a young man."

I would reverse and would affirm on the able and (to me) convincing adjudication of the chancellor, former President Judge WALTER BRAHAM.