**Panetta Estate**

*James W. Tracey, III,* for proponent.
*James J. Oliver,* for caveator.

TAXIS, *P. J.,* January 14, 1975—This is a will contest over a writing dated July 8, 1972, alleged by Josephine Giorno, decedent's daughter, to be his last will and testament. Contestant is Vincent Panetta, decedent's son.

Decedent died on August 14, 1972. He spoke English imperfectly, and was almost illiterate in the language. The writing in dispute was presented to the register of wills for probate on December 4, 1973, by Josephine Giorno alone, unaccompanied by Vincent Panetta, although they both are named co-executors. A citation then issued requiring Vin-

cent Panetta to show cause why he should not qualify as co-executor, but the response to this was a formal caveat against the probate of the document, alleging lack of testamentary capacity, fraud and undue influence. The matter was certified to this court by the register of wills.

The alleged will leaves decedent's estate in equal shares to contestant and proponent, but an earlier testamentary document dated February 29, 1972, left the entire estate to Vincent Panetta. Decedent lived with his son, Vincent Panetta, at the time of his death and for some time previously. The reasons behind the preparation of the February 1972 will do not appear in the record. There is testimony, however, that for a period of time prior to his death, decedent had unsuccessfully sought the making of a new will by some of his friends or relatives. This was finally arranged with the assistance of proponent's husband, Louis Giorno, who took decedent to the office of Mr. Charles Michel, a real estate broker in Philadelphia. For several years, Mr. Michel had performed services in connection with property owned in Philadelphia by decedent. Mr. Michel testified that he received the instructions for the content of the document from decedent in his office, and that he was able to prepare a will which, in some respects, looks lawyer-drawn because of a long familiarity with the law of wills. The will, which was typed as an original and a carbon copy, was not executed in Mr. Michel's office, but both copies were taken by Mr. Giorno and kept by him. Decedent thereafter took the papers to the business place of certain friends, the Errichetti Funeral Home, where they were executed and witnessed as will be discussed below in more detail.

The evidence concerning lack of testamentary

capacity is very sketchy and not nearly strong enough for contestant to prevail on this ground. There is evidence that decedent was ill toward the end of his life, but physical illness is not the equivalent of the mental weakness which must be shown to invalidate a will: Union Trust Co. of New Castle v. Cwynar, 388 Pa. 644 (1957). Decedent was able to drive a car until almost the end of his life, and was also able, by himself, to arrange the meeting at which the writing was executed and witnessed. Keeping in mind the language difficulties which decedent had, the record utterly fails to show lack of testamentary capacity.

Neither do the issues of fraud and undue influence require extended discussion. Neither was proven. Contestant seeks to draw many inferences from the fact that Mr. Giorno physically aided decedent in getting to a person who could type the will he wanted, but there is no evidence that Mr. Giorno had anything whatever to do with its provisions. Moreover, no inference of improper conduct can be drawn from the fact that proponent kept the will until it was executed and thereafter, since, no matter how closely it was guarded, its content could not have been changed by her. Contestant also complains that his sister did not inform him of the new will, implying that there was something clandestine about the procedure because of that; but contestant, for his part, did not tell his sister about the February 1972 will, nor that decedent also had transferred title to some of his real estate to contestant at that time.

Nor is this a case where the burden of proof is shifted to proponent, since almost none of the elements required to produce this result are present: Heffner Will, 19 Fiduc. Rep. 542, 545 (1969). Re-

garding the existence of a confidential relationship, there is nothing in this record to show that decedent was subject to "an overmastering influence . . . dependence or trust" in the case of Mrs. Giorno (Leedom v. Palmer, 274 Pa. 22, 25 (1922)); or that "something in the relationship or circumstances of the donor and the donee [makes] it doubtful that the normal presumption of a gift has any basis in reality": Dzierski Est., 449 Pa. 285, 290 (1972). In short, there was no proof whatever that the content of the document is not exactly what decedent intended it to be.

The most significant issue in the case, although not framed in the pleadings, concerns the execution of the writing. As noted previously, it was prepared in duplicate, an original and a carbon copy, and both were executed by decedent and witnessed by the subscribing witnesses. The original, submitted for probate, bears on the line for testator's signature a strong and well-written "John," followed by weak, shaky and irregular handwriting which is, to a great extent, undecipherable, but which can be read "John Panetta." A similar near-illegible signature appears on the carbon copy as well, but it is not preceded by any other writing. Both the original and the carbon copy were witnessed by Marie Errichetti and Vincent Pullo.

Marie Errichetti testified that at the time John Panetta signed his name to the documents, she and an employe of the Errichetti Funeral Home, Vincent Pullo, were in the room. She testified specifically that she saw decedent write his name, although stating that his hand shook a good deal. She could not explain why the name "John" appeared

plainly while the balance of the handwriting was so unclear.

However, Vincent Pullo clarified what had occurred. He stated that when decedent, Marie Errichetti and he gathered for the execution of the will, there was a fourth person in the room, John Errichetti, who at first was intended as the second witness, along with Marie Errichetti. Mr. Pullo stated that before decedent signed his name, John Errichetti began to sign as a witness by starting to write his name on the signature line provided for testator. Mr. Pullo stopped him after his first name, "John," was written, and at that point John Errichetti had to leave the room to meet with a client. For this reason, Marie Errichetti became the second witness, and signed along with Mr. Pullo after testator had placed his signature on the will. Mr. Pullo also testified that he read the document to decedent in English, and, to the extent that he could, in Italian. Both the original and carbon copy were signed and witnessed, and thereafter delivered to the Giornos who came to the funeral home some time later.

Contestant questions the legal sufficiency of this execution. With respect to the signature itself, the rule is simply that any sort of a mark or writing intended by the signer as a signature will serve as such: Olevich Est., 14 Fiduc. Rep. 265 (1960). Therefore, in this respect there is no difficulty, since testator plainly intended what he wrote to be his signature on his last will and testament. With respect to the requirement of proof of execution by two subscribing witnesses, each must separately attest to all of the facts required to prove the will

(Brantlinger Will, 418 Pa. 236 (1965)), and this has been accomplished here. The only possible doubt arises because one of the witnesses testified that the clearly written name "John" was placed on the signature line of the document by another person erroneously, and the other witness was unclear as to how the name got there, or why. While this might be regarded as inconsistency of a sort, it is no reason for us to conclude that as to the fact of signing there is any lack of credibility in the testimony of either witness. Both stated without qualification that they were present and saw testator sign his name, and the fact that both do not recall with equal clarity other events that took place near the same time, or do not recall them in exactly the same way, is neither unusual nor particularly damaging to their credibility, in the total absence of any direct evidence of inaccuracy or untruthfulness. Contestant argues from Mr. Pullo's testimony that the first name of testator as written is not his and that, therefore, the writing is not properly signed; but this argument fails in light of the fact that testator's full signature, "John Panetta," appears on the signature line thereafter. And, finally, none of these difficulties exist with respect to the carbon copy, on which testator's signature appears without any preceding matter; this paper itself could be probated since, clearly, neither it nor the original ribbon copy was ever revoked: Dawson's Est., 277 Pa. 168 (1923). Cf. Zell's Est., 329 Pa. 312 (1938).

And now, January 14, 1975, the caveat is dismissed, and the register of wills is directed to admit the writing dated July 8, 1972, to probate as decedent's last will and testament when the same is presented according to law.