J-A16015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ESTATE OF: SIDNEY ROTHBERG, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: MICHAEL ROTHBERG | |
| | No. 2391 EDA 2014 |

Appeal from the Decree July 21, 2014
in the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 673AP of 2009

| | |
|---|---|
| ESTATE OF: SIDNEY ROTHBERG, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: LYNN KEARNEY | |
| | No. 2795 EDA 2014 |

Appeal from the Decree July 21, 2014
in the Court of Common Pleas of Philadelphia County
Orphans' Court at No.: 673AP of 2009

BEFORE: LAZARUS, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.: **FILED JUNE 26, 2015**

---

[*] Retired Senior Judge assigned to the Superior Court.

In these consolidated cases, Appellants Michael Rothberg (Rothberg) and Lynn Kearney (Kearney),[1] appeal from the Orphans' court decree denying their petitions challenging the will of decedent, Sidney Rothberg (Decedent), dated January 21, 2002, offered for probate by Appellee, Saranne Rothberg-Marger. We affirm.

In its July 21, 2014 Findings of Fact, Discussion, and Conclusions of Law, the trial court fully and correctly sets forth the factual and procedural history of this case. (**See** Trial Court Opinion, 7/21/14, at 1-12).[2] Therefore, we have no reason to restate them here.

Rothberg raises nine issues for this Court's review:[3]

[1.] Whether the trial court erred as a matter of law or abused its discretion in refusing to disqualify counsel for [Appellee], who also claimed to represent the estate and [Appellee's] sole corroborating witness, and who had previously received extensive confidential information from [Rothberg] during several consultations[?]

[2.] Whether the trial court's conclusion that the evidence at trial established that [D]ecedent was a Pennsylvania domiciliary at the time of his death was clearly erroneous[?]

[3.] Whether the trial court abused its discretion in permitting [Appellee] to deliberately conceal evidence regarding a key event in the case while crediting the testimony of an admittedly biased and perjured witness on that same issue[?]

_____

[1] Kearney is acting *pro se* in this appeal.

[2] The opinion is dated July 18, 2014, and was filed on July 21, 2014.

[3] We have renumbered most of Rothberg's issues for ease of analysis and disposition.

[4.] Whether the trial court erred as a matter of law or abused its discretion by holding that the evidence (including evidence that [Appellee] and her sole corroborating witness misrepresented [Rothberg's] intentions to Decedent, together with the forged witness signature), failed to establish undue influence directly[?]

[5.] Whether the trial court erred as a matter of law or abused its discretion by concluding that the evidence failed to establish a presumption of undue influence[?]

6. Whether the trial court's conclusion that the uncontradicted evidence at trial failed to prove insane delusion was clearly erroneous[?]

7. Whether the trial court's conclusion that the evidence at trial failed to prove fraud was clearly erroneous[?]

[8.] Whether the trial court erred as a matter of law or abused its discretion by ignoring the uncontradicted evidence that the purported witness signature on the probated will of the [D]ecedent is a forgery[?]

[9.] Whether the forged witness signature of the probated will undermines the will's authenticity as a matter of law[?]

(Rothberg's Brief, at 3-4).[4]

_____

[4] Kearney joins and adopts the contents of Rothberg's brief and raises additional "points" for consideration. (**See** Kearney's Brief, at 2-3). However, Kearney's *pro se* brief utterly fails to conform to our rules of appellate procedure. Significantly, it does not include a statement of the questions involved, in violation of Pennsylvania Rule of Appellate Procedure 2116. **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"). The brief primarily consists of a narrative summarizing her view of the facts of this case, with no discussion of legal authority to support her claims. **See** Pa.R.A.P. 2119(a),(b); **see also** Pa.R.A.P. 2101 ("[I]f the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed"); **In**
*(Footnote Continued Next Page)*

The appropriate scope and standard of review on appeal from a decree of the Orphans' Court adjudicating an appeal from probate is as follows:

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Nalaschi,* 90 A.3d 8, 11 (Pa. Super. 2014) (citation omitted).

In the first issue, Rothberg argues that the trial court erred by denying his motion to disqualify Karl Prior, Esq., counsel for Appellee. (**See** Rothberg's Brief, at 81; Decree, 12/28/11, at 1). Rothberg claims that Mr.

(Footnote Continued) ——————————

*re Estate of Whitley*, 50 A.3d 203, 209 (Pa. Super. 2012), *appeal denied*, 69 A.3d 603 (Pa. 2013) ("Failure to cite relevant legal authority constitutes waiver of the claim on appeal.") (citation omitted).

We note with respect to Kearney's *pro se* status that, while we are willing to construe liberally the materials she filed, she "is not entitled to any particular advantage because she lacks legal training." **Branch Banking & Trust v. Gesiorski**, 904 A.2d 939, 942 (Pa. Super. 2006) ("[A]ny layperson choosing to represent [herself] in a legal proceeding must, to some reasonable extent, assume the risk that [her] lack of expertise and legal training will prove [her] undoing.") (citations omitted).

Accordingly, we deem the issues raised in Kearney's defective brief waived.

Prior's disqualification was necessary because, in the weeks following Decedent's death, he contacted Mr. Prior as a prospective client seeking representation and disclosed potentially harmful information, including his thoughts and impressions about the case. (*See* Rothberg's Brief at 82, 87, 89-90 (citing Pennsylvania Rule of Professional Conduct 1.18, Duties to Prospective Clients)). This issue does not merit relief.

> When reviewing a trial court's order on disqualification of counsel, we employ a plenary standard of review. Courts may disqualify attorneys for violating ethical rules. On the other hand, courts should not lightly interfere with the right to counsel of one's choice. Thus, disqualification is appropriate only when both another remedy for the violation is not available and it is essential to ensure that the party seeking disqualification receives the fair trial that due process requires.

***Weber v. Lancaster Newspapers, Inc.***, 878 A.2d 63, 80 (Pa. Super. 2005), *appeal denied*, 903 A.2d 539 (Pa. 2006) (citations and quotation marks omitted).

> A court's authority to disqualify counsel based on Rules of Professional Conduct is limited. In ***In re Estate of Pedrick***, . . . 482 A.2d 215 ([Pa.] 1984), our Supreme Court stated that "this court has held in several cases that counsel can be disqualified for violations of the Rules of Professional Conduct where disqualification is needed **to ensure the parties receive the fair trial which due process requires.**" *Pedrick,* [*supra*] at 221 (emphasis added). Our Supreme Court continued:
>
> > Thus, while it may be appropriate under certain circumstances for trial courts to enforce the Code of Professional Responsibility by disqualifying counsel or otherwise restraining his participation or conduct in litigation before them in order to protect the rights of litigants to a fair trial, we are not inclined to extend that enforcement power and allow

our trial courts themselves to use the Canons to alter substantive law or to punish attorney misconduct. ***Id.***

In addition, our Supreme Court, in ***Reilly by Reilly v. SEPTA***, . . . 489 A.2d 1291 ([Pa.] 1985), limited the authority of both trial and appellate courts to sanction counsel for violations of the Rules of Professional Conduct as follows:

> Perceived violations of [the Pa.R.P.C.] do not permit the trial courts or the intermediate appellate courts to alter the rules of law, evidentiary rules, presumptions or burdens of proof. **More importantly, violations of those Codes are not a proper subject for consideration of the lower courts to impose punishment for attorney or judicial misconduct.**

> We have not abdicated or delegated any of our supervisory authority in enforcing these standards of conduct to Superior Court. To presume that the Code or its alleged violations can be reviewed by any tribunal other than those we authorize is a misapprehension of the purpose of the Code, and is seen as an impermissible meddling into the administrative and supervisory functions of this Court over the entire judiciary.

***Reilly***, [***supra***] at 1299 (emphasis added). ***Reilly*** clearly limits the intermediate appellate and trial courts' authority to impose punishments for violations of the Rules of Professional Conduct.

***Vertical Res., Inc. v. Bramlett***, 837 A.2d 1193, 1201-02 (Pa. Super. 2003).

Further, while a trial court can sanction counsel by disqualification based on a violation of the Rules of Professional Conduct, the court must have evidence in the record to support a conclusion that the attorney violated the particular rule at issue. ***See McCarthy v. Southeastern***

***Pennsylvania Transp. Auth.***, 772 A.2d 987, 989 (Pa. Super. 2001), *appeal denied*, 812 A.2d 1230 (Pa. 2002).

Here, Rothberg relies on Pennsylvania Rule of Professional Conduct 1.18 to support his claim that Mr. Prior's disqualification was necessary. (***See*** Rothberg's Brief, at 87). This rule provides in pertinent part:

**Rule 1.18. Duties to Prospective Clients**

(a) A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b) Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal information which may be significantly harmful to that person except as Rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer learned information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). . . .

Pa.R.P.C. 1.18.

In the instant case, Mr. Prior testified that he had three telephone conversations with Rothberg as a prospective client, lasting approximately fifteen minutes, forty minutes, and three minutes, respectively. (***See*** N.T. Hearing, 8/16/11, at 96). During the calls, Rothberg provided Mr. Prior with superficial information about the case, and they discussed the issues of undue influence and testamentary capacity in general, discussing no more information than is available on Prior's law firm's public website. (***See id.***

95, 107-08). Mr. Prior further testified that, during his conversations with Rothberg, Rothberg did not disclose any information that was not a matter of public record, discoverable on the Internet, or that Appellee would not have known. (*See id.* at 121-22). Mr. Prior decided not to accept Rothberg as a client after he learned through an Internet search that Rothberg was a convicted felon, which raised concerns regarding his credibility. (*See id.* at 115-16). Mr. Prior also declined to represent Rothberg because Rothberg asked for a contingent fee arrangement, which was not Prior's typical billing practice. (*See id.* at 112). Mr. Prior stated that he did not give Rothberg any legal advice, and that he did not send Rothberg an engagement letter or an invoice. (*See id.* at 123, 125-26).

In contrast, Rothberg testified that he had several phone conversations with Mr. Prior, during which they discussed myriad topics, including: a will purportedly drafted in 1975; healing oils he introduced to Decedent; Rothberg's account of the "original incident"[5]; a meeting with Decedent's cardiologist; Decedent's alleged abuse of Rothberg during his

_____

[5] The parties place much emphasis on their conflicting accounts of what occurred during an episode involving Decedent's health they refer to as the "original incident." (Trial Ct. Op., at 18-20). Specifically, Appellee claims that, in August 1995, Rothberg tried to prevent her from taking Decedent to the hospital when he needed medical attention. (*See* Appellee's Brief, at 7-8, 38). Rothberg disputes this allegation, maintaining that he did not refuse Decedent medical care and that the incident took place in April 1994, not 1995. (*See* Rothberg's Brief, at 8-9).

childhood; Rothberg's felony conviction for arson; his alleged discussions with Decedent about arson; a purported mafia investigation; and Rothberg's understanding that Decedent's domicile was in New York City. (*See* N.T. Hearing, 5/20/11, at 210-25).

The trial court, after considering the testimony, credited Mr. Prior's account of the initial consultations, and determined that disqualifying him from representing Appellee was not necessary to ensure that the parties received a fair proceeding. (*See* Decree, 12/28/11, at 1); *see also Vertical Res., Inc.*, *supra* at 1201-02; Pa.R.P.C. 1.18. After review, we agree, and conclude that the record fully supports the trial court's decision. The first issue does not merit relief.

With respect to Rothberg's remaining issues, after a thorough review of the record, in the light most favorable to Appellee, as required under our standard of review, *see In re Estate of Nalaschi*, *supra* at 11, the briefs of the parties, the applicable law, and the comprehensive and well-reasoned opinion of the trial court, we conclude that they are meritless. The trial court properly disposes of the questions presented. (*See* Trial Ct. Op., at 15, 19-21, 27-29, 31, 33-35) (finding: (1) court did not err in concluding that Decedent was domiciled in Philadelphia; (2) court did not abuse its discretion in crediting testimony of Appellee and Nellie Ingram regarding date of "original incident"; (3) evidence did not directly establish undue influence; (4) evidence did not establish presumption of undue influence; (5) evidence did not show 2002 Will was product of Decedent's insane delusion;

(6) evidence did not demonstrate that will was procured through fraud; (7) evidence failed to establish that witness signature on 2002 Will was forged; (8) a witness's signature is not required for execution of a valid will in Pennsylvania, and evidence demonstrated Decedent's signature on will proper).  Accordingly, we affirm the findings on the remaining issues on the basis of the trial court's opinion.[6]

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/2015

---

[6] Appellee has filed an application to strike point six of Rothberg's reply brief, claiming that it is improper because it raises a new argument not addressed in his plenary brief, and nothing Appellee said in her brief opened the door to his argument.  (**See** Application to Strike, 5/05/15, at 4-5).  We agree, and hereby grant Appellee's application.  **See** Pa.R.A.P. 2113(a), note.

20090067302322

# COURT OF COMMON PLEAS OF PHILADELPHIA

## ORPHANS' COURT DIVISION

O. C. No. 673 AP of 2009

**Estate of SIDNEY ROTHBERG, Deceased**

<u>Findings of Fact, Discussion</u>
<u>and Conclusions of Law</u>

O'KEEFE, ADM. J.                                                    July /8, 2014

### Introduction

This matter comes before the Court on the petitions of Michael Rothberg and Lynn Kearney (aka Lynn Rothberg/Lynn Rothberg Kearney). By separate petitions Michael Rothberg and Lynn Kearney contest that Sidney Rothberg was domiciled in Pennsylvania at the time of his death. Petitioners allege that the Register of Wills in Philadelphia County has no jurisdiction to issue letters and to probate a will written on January 21, 2002. Additionally, Petitioners challenge three separate documents executed on April 15, 1994, October 30, 2000, and January 31, 2002. Petitioners allege that each of these "purported wills" is the product of undue influence. On the basis of their pleadings, Petitioners also appear to attempt to make claims that these documents were the result of fraud, forgery and insane delusion.

### Procedural History

Sidney Rothberg died on May 13, 2008, at the age of eighty-three, in Tenafly, New Jersey. Sidney Rothberg was not married at the time of his death.

On May 30, 2008, Saranne Rothberg Marger, decedent's daughter, filed a Petition with the Register of Wills of Philadelphia County offering a typewritten document dated January 21, 2002 for probate. Said document has been marked as S-27and reads as follows,

"January 21, 2002

Being of sound mind, I Sidney Rothberg, appoint Saranne Rothberg Executrix of my Estate. If for any reason Saranne Rothberg ceases to be my Executrix, I desire that Rei Rothberg become my Executor until Lauriel Harte Marger becomes 22 years of age.

I also leave my entire estate to my daughter, Saranne Rothberg, whether it be cash, bonds, stocks, jewelry, real estate, paintings, sculpture, works of art including furniture, toys, photographs, memorabilia and any objects made of gold or silver with only the following exceptions:

I bequeath to Michael Rothberg the Boudin painting, "Winter Landscape with Hunter Firing at Birds." If at the time of execution of this will this paining is not in my estate's possession I will its present value of $55,000 to Michael. I also will $120,000 face value of Municipal Bonds with a 2 to 10 year maturity. Michael is to receive all interest accumulated on a yearly basis. He is not allowed to cash any bonds until their maturity with one exception: The bonds may be cashed to pay for care of health problems including the restoration of his sight. However, medical bills must be paid directly to the billing parties. This is limited to physicians, hospitals and the billing party is to be paid directly.

I also leave $5,000 to Nellie Ingram in memory of what she was and not who she is."

On June 3, 2008, the Register of Wills issued a Decree where it admitted the 2002 document to probate as the last will and testament of Sidney Rothberg. The Register of Wills also granted Letters of Administration C.T.A. to Saranne Rothberg Marger.

On May 29, 2009, Michael Rothberg, filed a Notice of Appeal from the probate of the 2002 document, and his first Petition for Citation Sur Appeal. Michael alleged that his father lacked testamentary capacity on January 21, 2002 and that the 2002 document was the product of undue influence exerted on his father by Saranne Rothberg Marger.

On October 16, 2009, Saranne Rothberg Marger preliminarily objected to Michael's petition. Saranne asserted primarily that Michael lacked standing to contest the 2002 Will, as Decedent had executed a prior will on April 15, 1994. In the earlier 1994 Will, decedent left Petitioner a smaller inheritance than the probated 2002 Will. The 1994 Will has been marked as S-25and reads as follows,

> "Last Will and Testament                                         April 15, 1994
>
> I, Sidney Rothberg, bequeath to Michael Rothberg the large Eugene Boudin painting between the living room and kitchen at the above listed address and the Emlen Etting paintings which he has expressed a desire to own.
>
> I bequeath, Nellie Ingram the sum of ten thousand dollars plus one thousand dollars for each year I have lived beyond the above date.
>
> I bequeath everything else I own to Saranne Rothberg Marger.
>
> Saranne Rothberg Marger is to act as Executor, Administrator, Conservator or land Trustee of my Estate."

This Court sustained Saranne's Preliminary Objections without prejudice to Petitioner's right to file an Amended Petition for Citation Sur Appeal from Probate. On February 12, 2010, Michael filed an Amended Petition for Citation Sur Appeal from Probate.

Thereafter, Michael Rothberg filed numerous petitions, including an Emergency Petition for Allowance for a distribution from the Estate, as well as two petitions seeking to disqualify

Saranne's counsel as attorneys in all matters concerning the Estate of Sidney Rothberg. After a hearing, this Court granted Petitioner's request to disqualify attorney Alan Markovitz, Esq.

On November 5, 2012, nearly three and a half years after Petitioner's first Petition for Citation, Petitioner filed a Petition to Revoke Letters. In his petition, Michael Rothberg asserts that Sidney Rothberg was not domiciled in Pennsylvania at the time of his death and therefore the Register of Wills in Philadelphia County had no jurisdiction to issue letters and probate the 2002 Will.

From 2009 forward, the probate of the 2002 Will by Saranne was simultaneously challenged by Petitioner Lynn Kearney. On May 13, 2009, Lynn Kearney filed her first Petition for Citation Sur Appeal. In her petition, Lynn alleged that she was the illegitimate daughter of Sidney Rothberg and was entitled to share in his estate if this Court found the 2002 Will to be void. Saranne also preliminarily objected to Lynn's petition on the basis of standing. The basis of the standing objection was that Lynn would not benefit from the disqualification of the 2002 Will, as she did not stand to inherit more under the 1994 Will. Lynn Kearney was not named in the 1994 Will.

On January 11, 2010, this Court sustained Saranne's Preliminary Objections without prejudice to Petitioner's right to file an Amended Petition for Citation Sur Appeal from Probate. On February 9, 2010, Petitioner filed an Amended Petition for Citation Sur Appeal.

This Court scheduled a hearing to take place on April 25, 2013 to receive evidence on the question of whether Lynn Kearney was a child of Sidney Rothberg. On April 17, 2013, Petitioner Kearney filed a petition seeking the exhumation of Sidney Rothberg's body for DNA testing.

4

On May 23, 2013, Saranne Rothberg Marger filed a Praecipe to Withdraw her Preliminary Objections to Lynn Kearney's Amended Petition for Citation Sur Appeal from Probate. On September 4, 2013, the question of whether Lynn Kearney was a child of Sidney Rothberg was settled, resolved and closed following Saranne's withdrawal of her Preliminary Objections. In the September 4, 2013 Decree this Court held that in all matters involving the Estate of Sidney Rothberg, Lynn Kearney was deemed to be the child of Sidney Rothberg. Additionally, Lynn Kearney was deemed to have standing to challenge the decedent's domicile, as well as standing to challenge the validity of the 2002 and 1994 wills.

In December 2013, February 2014 and March 2014, this Court held several weeks of hearings to receive evidence on the issues raised in the Pleadings concerning domicile and undue influence. Petitioners and Respondent called numerous witnesses to testify including, Louis Burke, Esq., Theresa Rothberg, Saranne Rothberg Marger, Tara Darnell Rothberg, Lynn Kearney, Jesse Coleman, Nellie Ingram, Rei Rothberg and Courtney Sahm. Petitioner and Respondent also offered numerous exhibits at trial. Among the exhibits introduced into evidence was a 2000 Will, marked as S-26, which reads as follows,

> "Last Will and Testament                    October 30, 2000
>
> I, Sidney Rothberg bequeth to Michael Rothberg the large Boudin painting hanging in the living room at the above address or $50,000 if it no longer there. Plus two Emlen Etting paintings of his choice.
>
> I bequeth Nellie Ingram $5,000 (for what she was not for what she became)
>
> I bequeth to Saranne Rothberg everything else that I own.
>
> Saranne Rothberg is to act as Executor, Administrator, Conservator and/or trustee of my estate."

5

## Findings of Fact

### Background

1. Sidney Rothberg was born on December 17, 1924 in Philadelphia.

2. Sidney Rothberg grew up in Atlantic City, New Jersey.

3. Sidney Rothberg attended the University of Pennsylvania and graduated in 1949.

4. Michael Rothberg was born to Marybeth Devins on September 25, 1960. Michael Rothberg lived with and was raised by Sidney Rothberg.

5. In 1963, Sidney Rothberg married Marybeth Devins.

6. On June 14, 1963, Marybeth Devins and Sidney Rothberg had a daughter, Saranne Rothberg. At the time of Saranne's birth, Sidney, Marybeth Devins, Michael and Saranne resided at Park Towne Place in Philadelphia, Pennsylvania.

7. In 1967, Marybeth and Sidney's marriage dissolved.

8. Except for a period in 1975 where Saranne and Michael lived in Italy with Marybeth Devins, Sidney Rothberg raised both Saranne and Michael in Philadelphia. Sidney Rothberg insisted that Saranne and Michael return to Philadelphia from Italy in 1975.

9. In June 1998, Sidney relocated from the Park Towne Place apartments and purchased a penthouse at The Philadelphian in Philadelphia, Pennsylvania.

### Sidney Rothberg's Work and Other Business Ventures

1. In the mid 1960s Sidney Rothberg obtained a trading seat on the New York Mercantile Exchange.

2. By the 1970s, Sidney Rothberg began a routine of commuting daily to New York from Philadelphia for work.

3. In 1977, Sidney Rothberg and his father, Harry Rothberg sold their interests in an Atlantic City hotel. Harry Rothberg created irrevocable trusts for Michael and Saranne.

6

Sidney Rothberg and his brother, Gerald Rothberg were named as co-trustees of the trusts. The trusts provided for mandatory distributions to Saranne and Michael in 1990, 1995 and 2000.

4. In the mid 1980s, Sidney purchased an apartment on 66th Street in New York City. Sidney began a routine of staying in New York during the week and returning to Philadelphia on the weekends.

5. In 1991, Sidney allowed Saranne to use the 66th Street apartment and began renting an apartment on 62nd Street in New York City.

6. In 1992, Sidney Rothberg ran to be chair of the COMEX.

7. In 1994, Sidney Rothberg played a key role in the merger between the COMEX and NYMEX. Through an attorney, Louis Burke Esq., Sidney Rothberg would later monitor COMEX litigation.

8. In 1995, Sidney and Saranne bought an apartment at 200 East 57th Street in New York City.

9. In 2001, Sidney retained attorney Louis Burke, Esq. to draft a loan agreement for $300,000.00 to Simon Andrews.

10. Sidney Rothberg was an avid art collector. Sidney traveled to art auctions and would buy and sell art at auction.

11. In 2002, Sidney retained attorney Louis Burke, Esq. to investigate lawsuits into auction houses.

12. Sidney Rothberg maintained hundreds of accounts at different financial and banking institutions. Sidney would move funds between accounts based on different interest rates.

13. In 2007 and 2008, while Michael and Theresa worked for Sidney at The Jewish Home he would direct them to complete various financial transactions on his behalf.

### *Saranne Rothberg Marger*

1. As a young girl Saranne Rothberg assisted her father by performing errands for him such as going to the bank, visiting his safe deposit boxes and bidding for him at art auctions.

2. In 1981, Saranne left for college in Philadelphia. Saranne would live and work in California until the late 80s.

3. In 1991, Saranne married Joe Marger in Philadelphia.

4. In 1993, Saranne gave birth to a daughter, Lauriel Hart Marger in New York City.

5. In 1995, Saranne traveled with Sidney to Greece.

6. In 1999, Saranne was diagnosed with breast cancer.

7. In 2000, Saranne and Sidney would discuss Sidney's nephew, Rei Rothberg serving as Lauriel's guardian.

8. Saranne formed a charity Comedy Cures during her treatment for cancer.

9. Throughout the early 2000s, Sidney would travel with Saranne and Lauriel to Verbier, Russia, Disney World and Italy.

10. Sidney Rothberg executed a Power of Attorney in favor of Saranne Rothberg Marger on April 7, 2006.

11. From 2006 forward Saranne Rothberg would assist her father with the payment of bills and his social security. Saranne was also heavily involved in Sidney's healthcare decision-making.

8

*Michael Rothberg*

1. Michael Rothberg lived with Sidney Rothberg at Park Towne Place in Philadelphia until he left for college in 1978.

2. Michael Rothberg woke up blind in 1968 and is currently profoundly blind.

3. Michael Rothberg owned a nightclub in Philadelphia which burned down in 1990. As a result of this incident, Michael Rothberg was part of a grand jury investigation into a potential arson.

4. In 1990, Michael Rothberg began a relationship with Theresa Rothberg. Throughout 1990 and 1991, Michael and Theresa traveled the world.

5. In 1992, Michael and Theresa Rothberg moved to Florida and then to Washington state.

6. In 1993, Michael and Theresa Rothberg moved to New York.

7. In 1994, Michael and Theresa Rothberg returned to Florida.

8. In February 1995 Michael Rothberg was arrested for charges related to the fire at his nightclub.

9. In 1995, Michael Rothberg was convicted of destruction by means of fire and conspiracy to commit mail fraud in federal court.

10. In July 1996, Michael Rothberg married Theresa Rothberg in Philadelphia.

11. In 1997, Michael Rothberg reported to prison and would serve a total of eighteen months. Sidney Rothberg visited Michael once at Allenwood Prison in Montgomery County, Pennsylvania.

12. In 1998 Michael Rothberg was released from prison. Michael remained in the Philadelphia area. Michael, Theresa and their daughter Tara Darnell Rothberg would open two restaurants in Philadelphia, the European Union Café and the Dock Street Pub.

13. In 2002, Michael and Theresa Rothberg moved to Iowa. Michael and Theresa relocated subsequently to Nevada and New Mexico.

14. From 2002 to 2005, Sidney would give Michael cash gifts for his birthday ranging from $30,000.00 to $40,000.00.

15. In 2006, Michael and Theresa Rothberg moved to Ithaca, New York.

16. In 2007, Michael and Theresa visited Sidney at The Jewish Home and began working for him. During this time Sidney engaged in over 300 financial transactions.

17. In 2008 Sidney funded a trust entitled the Michael S. Rothberg Irrevocable Trust for the purchase of a home in New Jersey for Michael and Theresa. Saranne served as Trustee.

## *Nellie Ingram*

1. In 1976 or 1977, Saranne Rothberg approached Nellie Ingram about working for Sidney Rothberg.

2. In 1976 or 1977, Nellie Ingram began working for Sidney Rothberg at Park Towne Place. Initially she would assist him with caring for Saranne, housecleaning and preparing meals.

3. When Saranne Rothberg left to attend college in 1981, Nellie Ingram's responsibilities increased. Nellie Ingram would open and sort Sidney's mail, as well as run errands for Sidney at the apartment complex, banks and auction houses.

4. In 1997, Nellie would travel with Sidney, Saranne and Lauriel to Italy.

5. Nellie Ingram continued to work for Sidney until 2000. After a disagreement, Nellie stopped working for Sidney in October 2000.

6. Nellie Ingram and Sidney Rothberg reconciled in 2005. From 2005 until his death, Nellie worked for Sidney.

10

## *Lynn Kearney*

1. Lynn Kearney was raised with the belief that her father was a man named Sidney Rothberg and that he had died.

2. Throughout her life Lynn Kearney tried to determine if her father was indeed dead and researched Sidney Rothberg in an attempt to contact him.

3. Sidney Rothberg died without meeting Lynn Kearney.

4. In September 2013 this Court held that in all matters involving the Estate of Sidney Rothberg, Lynn Kearney was deemed to be the child of Sidney Rothberg. Lynn Kearney was deemed to have standing to challenge the decedent's domicile, as well as standing to challenge the validity of the 2002 and 1994 wills.

## *Sidney Rothberg's Wills*

1. On April 15, 1994, Sidney Rothberg handwrote and signed a Will on stationary bearing his name and the address of his apartment at The Philadelphian.

2. On October 30, 2000, Sidney Rothberg handwrote and signed a second Will.

3. In 2000 or 2001, Sidney asked his nephew Rei Rothberg to serve as executor of his estate should Saranne predecease him.

4. In 2002 Sidney handwrote a Will on looseleaf. That Will was typewritted and signed by Sidney on January 21, 2002.

## *Sidney Rothberg's Health*

1. In 2006, Sidney was hurt in a fall at his New York apartment. Sidney would recover at Care One in Dunroven, New Jersey.

11

2. Sidney Rothberg returned to Philadelphia from Care One and Nellie Ingram worked at The Philadelphian to assist Sidney.

3. Sidney Rothberg fell again at his New York apartment in 2007. Sidney would recover this time at The Jewish Home in Rockleigh, New Jersey.

4. Michael Rothberg and Theresa Rothberg would visit Sidney Rothberg at The Jewish Home in September 2007. Michael and Theresa attempted, but ultimately failed to take Sidney out of The Jewish Home.

5. Throughout 2007 and 2008, Michael and Theresa worked for Sidney at The Jewish Home. Sidney directed them on matters including his assets and various CD proceeds and bank accounts.

6. In 2008 Sidney would attempt to purchase an apartment at The Philadelphian for a home health care aide.

7. In 2008, Dr. Maryanne Forciea conducted a consultation with Sidney and his family and discussed hospice as well as Sidney's ability to return to The Philadelphian.

8. Sidney Rothberg moved from The Jewish Home to Saranne's home at 6 Sisson Terrace in Tenafly, New Jersey in May 2008.

9. On May 13, 2008, Sidney Rothberg died in Tenafly, New Jersey.

10. Shiva was held for Sidney in New Jersey and Pennsylvania.

11. Sidney Rothberg was buried in Springfield, Pennsylvania.

### Discussion

### I. *Domicile*

The domicile of a person is "where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *In re*

12

*Dorrance's Estate*, 309 Pa. 151, 173, 163 A. 303, 310 (1932), *cert denied* 287 U.S. 660 (1932).

Domicile is determined by the law of the forum, which in this case is Pennsylvania. *See, e.g.*

*Greenwood v. Hildebrand*, 357 Pa. Super. 253, 259, 515 A.2d 963, 965 (1986), *app. denied* 515

Pa. 594, 528 A.2d 602 (1987). The question of domicile is a mixed question of law and fact.

*Estate of Getz*, 611 A.2d 778, 780 (1992).

While a person may have many residences, they can only have one legal domicile. *In re*

*Lesker*, 377 Pa. 411, 416-17, 105 A.2d 376, 379-80 (1954). Sidney Rothberg was an extremely

successful businessman and at the hearings in this case it was established that throughout his life

he owned properties in at least three states: New Jersey, Pennsylvania and New York. To

determine Sidney's domicile at the time of his death it is necessary to focus on his intentions and

conduct. *Perelman*, 3 Fiduc. Rep. 3d. Pennsylvania courts have held that "it seems that a

person's domicile is increasingly being determined by close scrutiny of his subjective intentions

or state of mind as to whether or not he considers a particular place to be his home." *McKenna v.*

*McKenna*, 282 Pa.Super. 45, 50, 422 A.2d 668, 670 (1980); *see also Bell v. Bell, supra*, 473 A.2d

at 1075. Therefore, "[i]ntent, being purely subjective, must to a large extent be determined by the

acts which are manifestations of the intent." *Wallace v. Wallace, supra*, 89 A.2d at 771; *see also*

*Bell v. Bell, supra*, 473 A.2d at 1075.

There was substantial testimony in this case that Sidney began commuting to New York

City from Philadelphia on a daily basis in the mid 1960s. There was also substantial testimony

that by 1985 Sidney began spending the week in New York City, but returned to Philadelphia

every weekend. (N.T. 12/4/13, 98: 3/17/14; 73:2-74:6) Petitioners argue that once Michael and

Saranne left for college, New York City was where Sidney primary lived. It is undisputed that

while Sidney purchased New York apartments, he also maintained his two apartments at Park

Towne Place in Philadelphia until 2000. (N.T. 2/28/14, 6:13-10:25) It is also undisputed that Sidney purchased a two-floor apartment in The Philadelphian in 1998. This apartment had four bedrooms, several views of the city and was where Sidney relocated his belongings from his two Park Towne Place apartments. (N.T. 3/7/14, 195-195) By comparison, Louis Burke and Nellie Ingram testified that Sidney's apartments in New York City, the 66th Street apartment and later the 57th Street apartment, were used mainly as storage facilities. (N.T. 12/4/13, 83-84, 99)

The acts supporting that Sidney Rothberg was domiciled in Pennsylvania are numerous. They include Michael's testimony that Sidney visited with him numerous times in Philadelphia at both the European Union Café and Dock Street restaurant. (N.T. 2/28/14, 4:23-5:10) Additionally, Sidney Rothberg employed Nellie Ingram as his housekeeper and assistant in Philadelphia from the late 70s to 2005. (N.T. 3/17/14, 10:24-25) The visit to Dr. Forciea, which occurred at Sidney's urging, took place in Philadelphia. (Exhibits S-81, S-107: N.T. 3/19/14, 119:1-25) Saranne also testified extensively to Sidney Rothberg's social network, including several girlfriends, being located in Philadelphia. (N.T. 2/26/14, 151:20-152:8)

Other evidence of Sidney's domicile includes 325 financial statements which were sent to his Philadelphia address. (Exhibit S-57) Despite Louis Burke, Esq. being located in New York, the correspondence between Sidney and his lawyer were also addressed to Sidney's Philadelphia address. (Exhibits: M-11, M-13, M-14, M-15, S-101, S-102, S-103, S-104) Cards from Michael and Theresa, which were presented as evidence in this case, were addressed to Sidney in Philadelphia. (Exhibits: S-2, S-3, S-4, S-15) Sidney's Medicare card, the three disputed Wills and federal and state tax returns from 2000 to 2008 all bear Philadelphia addresses. (Exhibits: S-25, S-26, S-27, S-109 and S-111) There was testimony that Sidney maintained six of his seven safe deposit boxes in Philadelphia and that his long term physician and three of his lawyers were

14

from Philadelphia. (N.T. 2/25/14, 150:11-151:13; 2/28/14, 24:16-25:21) Finally, Sidney Rothberg was buried in Springfield, Pennsylvania, about ten miles outside of Philadelphia. (N.T. 2/26/14, 168:3-6)

There was also substantial evidence of Sidney's expressed intention to return to Philadelphia from the Jewish Home in Rockleigh, New Jersey. (N.T. 2/26/14, 167:23-168: 2 3/19/14, 113:7-114:25) First, Michael Rothberg testified that when he arrived at the Jewish Home Sidney was packed and ready to return to Philadelphia. (N.T. 2/28/14, 64:2-68:21) Additionally, Sidney explored obtaining an apartment at The Philadelphian for a home health care aide, presumably upon his release from the Jewish Home. (N.T. 3/17/14, 43:21-44:25; 3/19/14, 115:9-116:25, 120:1-13; Exhibits S-72, S-73) Sidney also explored installing a lift at the 21B21 penthouse to accommodate traveling between floors once he returned to Philadelphia from The Jewish Home. (Exhibit S-10) In her deposition and in the notes from her consultation with Sidney, Dr. Forciea evaluated Sidney's ability to return to the 21B21 penthouse in Philadelphia. (Exhibits S-81, S-107: N.T. 3/19/14, 119:2-25)

Despite this compelling evidence that Sidney was domiciled in Philadelphia, the Petitioners counter that Sidney was domiciled in either New York or New Jersey at death. Once a domicile is acquired it is "presumed to continue until it is shown to have been changed" by the standard of "clear and satisfactory proof." *Estate of Loudenslager*, 430 Pa. 33, 38-39, 240 A.2d 477, 470-80 (1968). The person asserting the change in domicile has the burden of proof. *Id.* To establish a change in domicile, "there must be the concurrence of the following factors: (1) physical presence in the place where domicile is alleged to have been acquired, and (2) an intention to make it his home without any fixed or certain purpose to return to his former place of abode. *Publicker's Estate*, 385 Pa. 403, 405-06, 123 A.2d 655, 688 (1956). Petitioner's burden

15

of showing this change of domicile is greater than required to show a continued domicile. *Loudenslager, supra.* The evidence presented that Sidney through both acts and intent was a domiciliary of Philadelphia is extensive. The burden to prove a change of domicile is significant and Petitioners did not meet their burden and demonstrate that Sidney changed his domicile from Philadelphia to New York City from approximately 1985 forward. While Sidney may have spent significant time in New York, especially for work obligations, domicile requires a showing of a continued presence and Petitioners did not meet this standard.

Interestingly, Petitioners also argue that Sidney was domiciled in New Jersey at the time of his death. Petitioners assert that when Saranne moved Sidney to Tenafly, New Jersey she intended that he would die there as a domiciliary of New Jersey. (Michael Rothberg's Proposed Findings of Fact and Conclusions of Law, pg. 35, ¶ 48, 49, 51) Since Saranne was appointed Sidney's agent under a Power of Attorney, Petitioners argue that it was Sidney's decision to become a domiciliary of New Jersey, as he had executed the Power of Attorney in favor of Saranne. While Sidney grew up in New Jersey and owned properties there, his presence in New Jersey over the final year of his life was motivated by heath care reasons. In the analogous case of *Estate of Loudenslager*, the Pennsylvania Supreme Court held that the decedent was domiciled in Philadelphia, even where due to frail health, the decedent had left Philadelphia for her daughter's home in Montgomery County and remained there until her death. *Loudenslager, supra.* Similarly, Sidney's move to The Jewish Home and then to Tenafly, New Jersey in the final days of his life occurred for health care purposes and did not result in the loss of domicile.

## II. Undue Influence

A will properly executed by decedent is presumed valid, i.e., there is a presumption of lack of undue influence. *Estate of Clark*, 461 Pa. 52, 334 A.2d 628 (1975). The burden of proof

16

is on the contestant to prove undue influence by clear and convincing evidence. Contestant may attempt to prove undue influence by either direct or indirect evidence. Direct evidence requires a showing that the free volition of the testator was overcome, by fraud, threats, misrepresentation, inordinate flattery, or physical or moral coercion, and the volition of another substituted therefor. *Quein Will*, 361 Pa. 133, 145, 62 A.2d 909, 915 (1949). If undue influence is attempted to be shown directly, the burden always remains upon the contestant. *Quein Will, supra* at 133.

Indirect evidence of undue influence requires the contestant to demonstrate that the testator was of weakened intellect at the time he made his will, and that one in a confidential relationship with decedent received a substantial benefit under the will, thus creating a presumption of undue influence. *Estate of Clark, supra*; *Estate of Fickert*, 461 Pa. 653, 337 A.2d 592 (1975), *Estate of Ziel*, 467 Pa. 531, 359 A.2d 728 (1976); *Estate of Dunlap*, 471 Pa. 303, 370 A.2d 314 (1977); *Estate of Younger*, 314 Pa. Super. 480, 461 A.2d 259 (1983). If, by the indirect method, all three elements are established by clear and convincing evidence, the burden of proof shifts back to the proponent of the Will. The proponent of the Will must then prove a lack of undue influence by clear and convincing evidence. *Estate of Clark, supra.*

Petitioners argue that each of the wills at issue in this case can be invalidated by a showing of undue influence. Petitioners argue the wills can be invalidated under both the direct and indirect methods for establishing undue influence.

### A. Direct Evidence of Undue Influence in the 2002, 2000 and 1994 Wills

Petitioners' direct evidence of undue influence includes allegations that Saranne and Nellie made statements to Sidney that Michael had attempted to poison and kill him in April 1994. Petitioners argue that these statements were so influential that they completely destroyed

17

Sidney's free agency and caused him to write the three wills at issue in this case. (Petitioner Michael S. Rothberg's Proposed Findings of Fact and Conclusions of Law, pg. 27, ¶ 8)

In the hearings and their pleadings before the Court both parties have devoted significant attention to what they refer to as "the original incident." For his part, Michael Rothberg maintains that he did not refuse his father medical care and honored Sidney's wishes not to be taken to a hospital. (N.T. 3/27/14, 101:9-108:2) By comparison, Saranne testified that Michael would not let her take Sidney to the hospital and prevented her and a friend from calling the police and leaving Sidney's New York apartment to obtain help. (N.T. 3/24/14, 160:11-214:4) Respondent also disputes the timeline created by Petitioners and maintains that the incident took place in August 1995, not in April of 1994. (N.T. 3/19/14, 28:16-30:5)

As stated, the burden for proving undue influence by the direct method remains on the contestant. The contestant must produce direct evidence of those facts and circumstances which he contends constituted undue influence. To constitute undue influence sufficient to avoid a will, there must be imprisonment of the body or mind, frauds or threats or misrepresentations, or circumstances of inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, or to destroy his free agency, or to operate as a present restraint upon him in the making of the will. *Keen's Estate*, 299 Pa. 430 (1930).

Petitioners contend that Saranne and Nellie made misrepresentations to Sidney regarding the incident which caused Sidney to fear for his life around Michael. However, Michael himself testified about his father participating in the argument about whether or not he should be taken to the hospital. (N.T. 2/27/14, 105:17-106:20) Additionally, Michael testified that Sidney spoke with Dr. Moses during the course of the incident on the phone and later at the hospital. (N.T. 2/27/14, 110:1-111:14) Michael explained that it was Dr. Moses who ran numerous tests and

18

urged Sidney to check into the hospital. (N.T. 2/27/14, 116:21-118:25) Rather than being unaware of what was occurring around him, Michael's testimony was that Sidney vocally opposed being admitted to the hospital and actively participated in the debate. If Sidney argued at length with both Saranne and Michael and then had a consultation with Dr. Moses regarding his hospitalization, it is unclear how he could be misled about Michael's involvement in the circumstances of his hospitalization.

Additionally, the testimony regarding Sidney's capabilities and demeanor, especially in 1994 through 1995 was of someone who was strong willed, opinionated and brilliant. This Court has difficulty believing that an individual travelling the world and participating in the highest levels of the COMEX/NYMEX merger would be so easily duped about an event at which he was present and actively participated.

This Court heard an abundance of conflicting testimony regarding the original incident. One of the central debates revolves around whether the incident occurred in April 1994, as Petitioners represent, or in August 1995, as Respondents have argued. Respondents argue that Michael has conflated a 1993 angioplasty with Sidney's hospitalization for a back problem in 1995. (Memorandum of Law in Support of Saranne Rothberg Marger's Proposed Findings of Fact and Conclusions of Law, pg. 58) Significantly, both Saranne and Nellie Ingram were able to testify as to the occurrence of this incident in 1995 and not 1994. (N.T. 3/17/14, 32:18-36:7; 3/19/14, 28:16-30:5) The importance of this incident potentially occurring in 1995 is that it could not have influenced Sidney's execution of the 1994 Will.

Nellie Ingram testified that she stayed in the hospital with Sidney during his admission for back problems in 1995. (N.T. 3/17/14, 34:1-36:16) Nellie also testified that she was not present for Sidney's angioplasty in 1993 and did not accompany him to the hospital in 1994.

19

(N.T. 3/17/14, 38:19-23) Interestingly, one of the only areas of agreement between Petitioner and Respondent in regard to the original incident is that Nellie travelled from Philadelphia to New York City to admit Sidney into Lenox Hill hospital. (N.T. 3/17/14, 34:1-36:16) This Court gives credibility to Nellie Ingram's testimony that the dispute over admitting Sidney to the hospital occurred in 1995 and that she travelled to New York for the sole purpose of bringing him to the hospital. In the early 90s Nellie was still working for Sidney and had been employed as a trusted friend for nearly 20 years prior. As her testimony in this case demonstrated she was a loyal employee and had no interests adverse to Sidney Rothberg. This Court gives credence to her testimony that the original incident and Sidney's resulting hospitalization occurred in 1995.

Petitioners offer no additional direct evidence of undue influence for the 2000 and 2002 Wills executed by Decedent. Instead, they rely on the testimony offered on the original incident as sufficient direct evidence to invalidate the two later wills, in addition to the 1994 Will. Notably, Michael testified that he called Sidney after the original incident to refute any allegations that he had attempted to hurt Sidney. (N.T. 2/27/14, 136:18-137:18) Michael also testified that Sidney reached out to him to schedule dinner and to give Michael gifts several months after the original incident. (N.T. 2/27/14, 139:15-25) Michael testified numerous times in this case that following the original incident Sidney provided money and other gifts to him and that the two met in Philadelphia or New York for meals.

Presumably, if there was a misunderstanding or some misrepresentation made to Sidney regarding the original incident then Michael corrected it. Indeed, Michael testified that this was the case, but the 2000 and 2002 Wills are very similar in providing limited gifts to Michael. Between the 1994 Will and the 2000 Will nearly six years had elapsed in which Michael had interacted with Sidney. Michael testified that in that time period he had spoken with Sidney to

20

refute the allegations surrounding the original incident. (N.T. 2/27/14, 136:18-137:18) And yet, the gifts to Michael in those two wills are nearly identical. The idea that Michael corrected the misrepresentations about the original incident, but that Sidney did not destroy the 1994 Will and went on to execute two nearly identical Wills strains credulity.

The allegations surrounding the incident are not sufficient direct evidence to invalidate either the 1994 Will or the two later Wills. To invalidate a Will through the direct method the contestants needed to present clear and convincing evidence that the misrepresentations about the original incident essentially overcame Sidney's free will as testator. The conflicting versions of the "original incident" and allegations about comments and statements made to Sidney are not enough to invalidate the three Wills at issue in this case.

### B. Indirect Evidence of Undue Influence in the 2002, 2000 and 1994 Wills

Petitioners also challenge each of the three Wills as procured through undue influence under the indirect method. Each of the three Wills was properly executed and each is presumed to be free of undue influence. This Court will determine whether any of the wills can be invalidated on the basis of indirect evidence of undue influence in reverse chronological order. Because Sidney presumably executed each subsequent Will with the intent that it revoked the prior Will, if a later Will is inoperative due to undue influence, the revocation would fail and the earlier Will remain in force. *Gardner on Wills*, Second Edition, at pg. 232-233.

### 1. 2002 Will

On May 30, 2008, Saranne filed a Petition with the Register of Wills offering a typewritten document dated January 21, 2002 for probate. Petitioners claim that this 2002 Will is invalid on the basis of undue influence. Petitioners have the initial burden of demonstrating that the testator was of weakened intellect at the time he made his will, and that one in a

21

confidential relationship with decedent received a substantial benefit under the will. *Estate of Clark, supra.* If they meet their burden, there is a presumption of undue influence which Respondent can then attempt to rebut. *Id.*

### a) *Weakened Intellect*

In support of Sidney suffering from a weakened intellect in 2002, the Petitioners point to Michael's testimony about several incidents where Sidney was forgetful. Michael testified that he had to "fill in the blanks" in his conversations with Sidney at the European Union Café. (N.T. 3/4/14, 7:11-8:6) Michael also testified that Sidney informed Michael and Theresa that he had repeatedly lost his credit cards. (N.T. 3/4/14, 9:5-20:3) Finally, Petitioners put forward other incidents, including where Sidney did not procure a specific watch as directed by Michael and where Sidney failed to start his car as evidence of weakened intellect. (N.T. 3/4/14, 10:24-13:16, 14:25-17:1)

It is difficult to offer a precise definition of weakened intellect other than to say that it is "bodily infirmity and greatly weakened mentality" which does not amount to testamentary incapacity. *Stewart Will*, 33543 Pa. 288, 286, 47 A.2d 204 (1946). When the challenge is based on undue influence, more credence and weight may be given to the contestant's remote medical testimony. *See Clark*, 334 A.2d at 634. Although Pennsylvania caselaw has not established a bright-line test by which weakened intellect can be identified to a legal certainty, courts have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation. *See Glover*, 669 A.2d at 1015.

Michael's testimony about Sidney's incidents of forgetfulness do not amount to establishing "persistent confusion, forgetfulness and disorientation" as required for weakened intellect. *Id.* Because of Michael's frequent travels and changing residences he often saw Sidney

22

intermittently. Part of the reason Sidney may not have recalled details of Michael's stories or life could be because of the large gaps in time in which they did not interact with one another and not due to weakened intellect on Sidney's part. Additionally, several of the incidents Michael and Theresa testified about occurred after 2002, and not at the time of the execution of the 2002 Will. This Court will not consider these incidents without the testimony of a medical expert that connects these later to an earlier weakened intellect. Notably, at no point during these hearings did Petitioners offer any testimony from a medical expert or doctor as to Sidney's mental capacity in 2002, or at any point from 1994 forward.

To establish weakened intellect, Petitioners also point to "inconsistencies" between Sidney's actions and the terms of his 2002 Will. These inconsistencies include Sidney's comments to Louis Burke, Esq. that he needed to divide his art for his children and Sidney's financial support of Michael during Sidney's life.

Louis Burke, Esq. testified that in 2002 or 2003 Sidney told him that he needed to catalog and divide his art for his children. (N.T. 12/4/13, 88-93) Michael points to the gifts in the 2002 Will as inconsistent with that statement. Despite the fact that the 2002 Will directs that Michael receive several paintings, Sidney's statements do not compel the conclusion that Michael was to receive a specific amount of Sidney's art. At best Louis Burke's testimony suggests that Sidney realized the storage of his art was disorganized and would make dividing it difficult. Louis Burke also testified about his relationship with Sidney and about the work Sidney engaged Mr. Burke to complete. Louis Burke, like many of the witnesses in this case, testified to Sidney being a fierce and savvy personality. Indeed, Louis Burke discussed Sidney retaining him to draft a complicated loan agreement in 2001, as well as an arrangement Sidney created where he

23

paid Mr. Burke's legal fees through the exchange of art. (N.T. 12/4/13, 88-93, 114; Exhibit S-96)

Finally, Michael's testimony about Sidney's financial support during life is not indicative of weakened intellect. Michael argues that Sidney's limited gift to him in the 2002 Will is inconsistent with Sidney's practice of supporting Michael financially during life and is evidence of a weakened intellect. While both Michael and Saranne were the recipients of numerous and expensive gifts from Sidney, it is not clear that Sidney supported Michael financially (each received up to $30,000.00 to $40,000.00 a year). There was testimony in this case about several of Michael and Theresa's business ventures. While it is undisputed that Sidney frequented Michael's nightclub, as well as Michael's café and restaurant in Philadelphia, there was not testimony that Sidney invested, managed or ran these companies for Michael's benefit. Additionally, several of the large bequests of money which Michael received from Sidney were directed by the Irrevocable Trust Harry Rothberg had created for Michael and Saranne. Paying these sums of money to Michael was not within Sidney's discretion and was a feature of Sidney's role as Trustee of the Trust. There was testimony that Sidney detested making these distributions to Michael and was concerned about Michael's ability to manage and invest money generally. (N.T. 3/10/14, 164:13-166:18) Generous gifting and providing large monetary gifts in life does not control how one may direct that their assets be handled in death. Petitioners' argument that there is an inconsistency between Sidney's financial gifts to Michael in life and the terms of the 2002 Will is not evidence of weakened intellect.

### b) Confidential Relationship

Petitioners point to the trust Sidney placed in Saranne and his delegation of financial and medical responsibilities to her as evidence of their confidential relationship. Petitioners also

argue that Saranne isolated Sidney from Michael and that Sidney's execution of a power of attorney in favor of Saranne is *de facto* evidence of a confidential relationship.

A confidential relationship exists when "the circumstances make it certain that the parties did not deal on equal terms, but on one side there is overmastering influence, and on the other, weakness, dependence or trust, justifiably reposed." *Leedom v. Palmer*, 274 Pa. 22, 25 (1922); *Estate of Clark, supra*; *Burns v. Kabboul*, 407 Pa. Super. 289, 308-309 (1991). It is created between ". . . two persons when it is established that one occupies a superior position over the other – intellectually, physically, governmentally or morally – with the opportunity to use that seniority to the other's disadvantage." *Union Trust Co. of New Castle v. Cwynar*, 388 Pa. 644, 653, 131 A.2d 133, 137 (1957). A confidential relationship is presumed to exist as a matter of law between an attorney-in-fact and principal. *Foster v. Schmitt*, 429 Pa. 102, 108 (1968).

Saranne provided ample testimony about her relationship with her father and the level of trust he placed in her. (N.T. 3/10/14, 166:19-25) Placing trust and responsibility in a child does not necessarily demonstrate a confidential relationship. *Northern Co. v. Huber*, 274 Pa. 329 (Pa. 1922). The relationship of trust must allow for some overreaching by one of the parties. Once again the testimony in this case about Sidney Rothberg was that he was not someone who could be pushed around by anyone. (N.T. 3/10/14, 95; 12/6/13, 98-99, 122) Michael testified that Sidney was strong willed and his version of the original incident relies on the premise that Sidney would not cooperate with Saranne and would not follow her directive to check into the hospital.

If trust and closeness were enough for a confidential relationship then based on Michael's testimony that Sidney trusted him, Michael and Sidney would also be in a confidential relationship. (N.T. 2/27/14, 146:25-148:1) Interestingly, Michael testified at length about how

25

Sidney called Saranne a liar and accused her of not caring about family. (N.T. 2/28/14, 84:10-15) Michael's own testimony about his conversations with Sidney cut against his representation that Sidney and Saranne were in a confidential relationship with one another. Instead, Michael's testimony would suggest that Sidney did not implicitly trust Saranne and certainly that Sidney did not do her or anyone else's bidding.

Petitioners' argument that Saranne isolated Sidney from Michael is also not supported by the testimony. Saranne provided abundant testimony about the time Sidney spent with her and her daughter Lauriel. In her testimony about their trips and vacations Saranne described her father as organizing and dictating the terms of the trip, thus the omission of Michael from these gatherings would appear to be Sidney's own choice. (N.T. 2/25/14, 101:3-103:14) Saranne also testified that she spent time with Michael, Theresa and their daughter Tara against her father's wishes. (N.T. 3/19/14, 11:14-12:3, 46:8-18) Finally, Michael testified about the close relationship he had with Sidney and about the time they spent together in Michael's Philadelphia restaurants and in New York City. There are certainly gaps in the time spent between Sidney and Michael, but it bears noting that Michael traveled extensively and moved frequently all across the country. Michael and Sidney not spending more time together was likely often due to geography, not isolation by Saranne.

Finally, while Sidney did in fact execute a power of attorney in favor of Saranne it bears noting that he did this in 2006. By 2006, Sidney's health had worsened and he experienced the first fall which led him to spend time rehabilitating at Saranne's home and at Care One in Dunroven. Sidney's execution of a power of attorney in 2006 appears to have been motivated by health care reasons and a desire to have Saranne deal with some of the administrative issues

he no longer tolerated. These same concerns were not at issue in 2002 when Sidney executed the 2002 Will.

### c) *Substantial Benefit*

Petitioners' rely on Saranne receiving the majority of Sidney's estate under the 2002 Will as sufficient evidence of substantial benefit. There is no hard and fast rule to "exactly define the character of benefit or the extent of interest [that] the confidential adviser must receive." *In re Estate of LeVin*, 615 A.2d at 41 (quoting *In re Adams' Estate*, 220 Pa. 531, 534, 69 A. 989, 990 (1908)). Pennsylvania courts have also held that merely being named an executor is not enough to establish substantial benefit. *See Estate of LeVin, supra,* at 44. Moreover, where there is a blood relationship between the testator and the beneficiaries of her estate, "[t]hat fact alone forms a sufficient, independent basis" for the bequest. *In re Estate of Simpson*, 407 Pa.Super. 1, 595 A.2d 94, 98 (1991). *Cf. In re Estate of Button*, 459 Pa. 234, 328 A.2d 480 (1974) (finding undue influence where confidants were not related to testator).

As noted elsewhere in this Opinion if the 2002 Will was invalidated based on undue influence, then the 2000 Will would be revived. Thus the terms of the 2000 Will are instructive in determining whether Saranne in fact received a substantial benefit under the 2002 Will. Sidney leaves Saranne "everything else I own" in the 2000 Will, as compared to his "entire estate" in the 2002 Will. (Exhibits S-26, S-27) In both Wills Sidney makes limited specific bequests to Michael and appoints Saranne as Executrix of his estate. When compared the gifts to Saranne in the 2002 and 2000 Wills are not different. In the 2002 Will as compared to the 2000 Will Saranne does not gain any additional benefit, she is still receiving the majority of Sidney's estate. Additionally, in both Wills Saranne is named as Executrix. The only major difference

27

between the two Wills is in the addition of Rei Rothberg as an alternate executor should Saranne predecease Sidney.

### d) Presumption of Undue Influence and Shifting Burden of Proof

Petitioners have not met their initial burden of demonstrating that the testator was of weakened intellect at the time he made the 2002 Will; that Sidney and Saranne were in a confidential relationship in 2002; and that Saranne received a substantial benefit under the Will. For this reason no presumption of undue influence was raised for the 2002 Will and the burden will not shift to Respondents to prove the absence of undue influence in the 2002 Will.

### 2. Indirect Evidence of Undue Influence for the 2000 Will and 1994 Will

Petitioners did not establish a presumption of undue influence for the 2002 Will. Because Petitioners did not meet their burden to invalidate the 2002 Will as the product of undue influence and the 2002 Will meets all the requirements for a valid Will under Pennsylvania law, the 2002 Will stands and this Court will not engage in an undue influence analysis of the 2000 and 1994 Wills.

## III.    Insane Delusion

Testamentary capacity is presumed and the burden of proving lack of testamentary capacity or an insane delusion is upon those who assert it. *In re Lauer's Will*, 351 Pa. 438, 41 A.2d 552; *In re Sturgeon's Will*, 357 Pa. 75, 53 A.2d 139, *O'Malley's Estate*, 370 Pa. 281, 88 A.2d 69; *Kerr v. O'Donovan*, 389 Pa. 614, 134 A.2d 213; *Williams v. McCarroll*, 374 Pa. 281, 97 A.2d 14.

There is no clear rule for what constitutes an insane delusion.   When considering a definition for insane delusion, the Pennsylvania Supreme Court in *Estate of Duross* stated that "the general rule is clear that it must be, as its name implies, an insane delusion, and that it must

28

have caused decedent to make his will in a manner entirely different from what he would have if the insane delusion did not exist." 395 Pa. 492, 498 (Pa. 1959).

Furthermore, "it is well settled that 'a delusion which will render invalid a will executed as the direct result of it is an insane belief or a mere figment of the imagination – a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist." *In re Alexander's Estate*, 246 Pa. 58, 62, 91 A. 1042. *See also McGovran's Estate*, 185 Pa. 203, 39 A. 816.

Petitioners write generally about Sidney being led to believe that Michael was trying to kill him in the highly disputed "original incident". According to Petitioners, this incident took place in April 1994. (N.T. 3/27/14, 170:16-178:9) Petitioners argue that each of the three wills in this case was the product of an insane delusion arising from Sidney's mistaken belief that Michael had attempted to kill him.

While the parties devoted a great deal of time to the "1994/1995 original incident," there was significant evidence in this case of Sidney Rothberg's astuteness as a businessman and art collector. Sidney's success and his continued participation in high level financial transactions undercuts the possibility that he suffered from an insane delusion when he executed three substantially similar wills over a period of nearly eight years. On the record established in this case this Court is confident that Sidney Rothberg was able to make careful judgments about his children and their strained relationship with one another. This Court does not believe that Sidney was suffering from insane beliefs or a figment of his imagination which influenced the gifts he made in each of his wills.

Petitioners point to Sidney being afraid of Michael as evidence of an insane delusion. Due to Michael Rothberg's frequent travels Sidney maintained intermittent contact with Michael

29

throughout 1991 to 2007. If Sidney was experiencing an insane delusion, which would lead him to be afraid for his life around Michael, then there is the question of why Sidney would have maintained any contact with Michael at all. The abundance of testimony in this case reflected not that Sidney feared Michael, but rather that Sidney distrusted Michael and was specifically concerned about Michael's ability to manage and invest large sums of money. (N.T. 2/24/14, 213:19-216:5, 146:7-147:13, 147:15-148:15; 3/10/14 162:14-166:25; 3/17/14, 39:3-41:6; Exhibit: S-90A) The three wills at issue in this case, as well as Sidney's healthcare directive and journal entries, reflect a common theme. (Exhibits: S-25, S-26, S-27, S-29, S-30, S-45) Under the heading "Mike," Sidney's journal entry reads as follows:

> "Under no circumstances am I to be placed under his care for medical or mental or health reasons
> He gets Boudin ptg. "Winter" (Hunter firing at geese in mountains) if he lost or sold $50,000
> If he needs money for his health reasons bills are to be paid directly to doctors or hospitals after authenticity checked $200,000 in Munis if used not spent for above things turned over to him."

Similarly, Sidney's healthcare directive provides:

> "If in the future I am incapacitated to the extent that I am unable to care for myself, under no circumstances am I to be placed in the custody of Michael Rothberg, his wife, or child. Nor do I want them involved in the choice of health institution, nursing or old age home, physicians."

Finally, Sidney asked his nephew Rei Rothberg and not Michael to serve as Executor in the event Saranne were to predecease him. (N.T. 3/10/14, 86:1-88:19) Rei testified that his uncle was not "anything other than sharp" and that in asking Rei to serve as executor, Sidney exhibited his characteristic "very forceful personality." (N.T. 3/10/14, 87:18-88:19) As noted earlier, an insane delusion "must have caused decedent to make his will in a manner entirely different from what he would have if the insane delusion did not exist." *Estate of Duross* at 498.

30

The consistency with which Sidney Rothberg sought to leave the majority of his estate to Saranne and prevent Michael's involvement in his affairs does not demonstrate an insane delusion.

## IV.    Fraud

The law on fraud in will contests is limited. The Superior Court of Pennsylvania explored fraud and undue influence in *Estate of Glover*, writing that "although undue influence is very much like fraud, the two are not identical." 447 Pa. Super. 509, 518 (1996) (quoting 31 Standard Pennsylvania Procedure 2d § 148:60). "Theoretically, fraud is separate and distinct from undue influence, since, when the former is exercised the testator acts as a free agent but is deceived into acting by false data, and when the latter is exercised the mind of the testator is so overmastered that another will is substituted for his own." *Id.*

To establish that the execution of a will was fraudulently induced, the contestant must prove that: (1) the testat[or] had no knowledge of the concealed or misstated fact, and (2) the testat[or] would not have made the same bequest had he known the truth. *Id.* at 519. In another will contest, the Pennsylvania Supreme Court wrote of the required specificity of pleading alleged fraud stating that "averments of fraud or mistake shall be averred with particularity." *Schofield Estate*, 505 Pa. 95, 103 (1984).

Once again Petitioners write about a series of misrepresentations made by Saranne and Nellie about the original incident. The misrepresentations allegedly made to Sidney include that: Michael denied Sidney medical care; Michael blocked Saranne from calling 911; Michael prevented Saranne from getting an ambulance; Michael pulled a phone out of the wall; Michael was going to kill Sidney and Michael told Nellie he was feeding Sidney popsicle and lead. (Petitioner Michael S. Rothberg's Proposed Findings of Fact and Conclusions of Law, pg. 32, ¶

31

33) Petitioners point to Michael's testimony that Sidney had treated his children equally and the alleged existence of a Wallen Will which split his estate 50-50 between his children. Petitioners argue that without these misrepresentations all three of Sidney's Wills would have been different.

For a fraud claim there must be some showing of either lack of knowledge about an essential fact or a misrepresentation of that essential fact. At the hearings and in their pleadings Petitioners have focused almost exclusively on the original incident and statements made about it to Sidney Rothberg. However, as discussed earlier in this Opinion, there was testimony that Sidney participated in the arguments about his hospitalization, consulted with doctors about his hospitalization and then spoke with Michael directly about the original incident. From the testimony in this case it is unclear what essential facts about the original incident would have been either unknown to Sidney Rothberg or concealed from him. Additionally, any potential misrepresentations or allegations about Michael's conduct were, as Michael testified, refuted by Michael in conversations with Sidney. (N.T. 2/27/14, 136:18-137:18)

Michael testified that Sidney told Dr. Moses that "he could not be expected to choose between his children" and that Sidney later admitted to being vulnerable after his hospitalization. (N.T. 2/27/14, 117:16-17, 141:8-14) This testimony, together with Sidney's continued interactions with Michael, demonstrate that Sidney understood what had occurred during the course of the incident and that he did not simply adopt the versions put forth by either of his children.

At best the testimony in this case about the original incident demonstrated that Michael and Saranne have differing memories of what occurred. As they each testified, they shared their respective version with Sidney. Two competing versions of a set of events does not necessitate

32

that one is a deliberate fraud. This is especially true here as Sidney Rothberg was an intelligent and strong willed individual. This Court is confident that Sidney was capable of perceiving and understanding what occurred around him and that he knew his children. Thus, the allegations of misstatements made about the original incident are not enough to demonstrate fraud to invalidate the 2002 Will.

## V.    Forgery

Petitioners also attempt to make an argument that the 2002 Will is forged. Petitioners state that the 2002 Will was only witnessed by one person, Douglas Roche. Douglas Roche, the concierge at Sidney's New York apartment, did not appear during the course of the trial. Mr. Roche did testify in a deposition, portions of which were read into the record during the hearings held in this case. When shown a copy of the 2002 Will at his deposition Douglas Roche indicated that the signature on it did not resemble his signature. (Douglas Roche Deposition, 12/1/13, 11:10-12) Mr. Roche also stated that he thought his signature may have been forged. (Douglas Roche Deposition, 12/1/13, 29:19-30:24) In support of their claim of forgery, Petitioners also argue that since Sidney could not type and the 2002 Will was typewritten it must have been forged by another individual.

The form and execution of a valid will is governed by 20 Pa. C.S. § 2501 and § 2502, which provide,

§ 2501. *Who may make a will.*

Any person 18 or more years of age who is of sound mind may make a will.

§ 2502. *Form and execution of a will.*

Every will, shall be in writing and shall be signed by the testator at the end thereof

(. . .)

The requirement that there be witnesses to the signing of a will was repealed by statute in Pennsylvania in 1974. *See generally*, 20 Pa.C.S. § 2504; 1974, Dec. 10, P.L. 867, No. 293, § 6. Thus, per the statute, Douglas Roche's signature was unnecessary to the execution of a valid will in Pennsylvania.

The 2002 Will also complies with the requirements of § 2501 and § 2502. As I held earlier in this opinion, the Will was signed by Sidney when he was of sound mind and the Will bears the signature of the testator. In addition, both Saranne and Nellie were able to verify Sidney's signature on the 2002 Will. 20 Pa.C.S. § 3132. There was no evidence offered to suggest that Sidney's signature, which is a necessary requirement for a valid will in Pennsylvania, was improper or a forgery.

In a will contest on the issue of forgery, the burden is on the contestant to prove forgery by clear, direct, precise and convincing evidence. *In re Kirkander*, 326 Pa. Super. 380, 385 (Pa. Super. 1984). In the current case, contestants were limited to reading portions of a witness's deposition and offering testimony that Sidney Rothberg did not type. In forgery cases it is often said that "suspicion and conjecture do not take the place of evidence." *Estate of Elias*, 429 Pa. 314, 320, 239 A.2d 393, 396 (1968). The contestants produced no expert evidence as to the handwriting of the decedent or the possibility that the decedent's signature on the 2002 Will was produced by some kind of forgery. For these reasons, an allegation of a forged will is given little weight and Petitioners cannot prevail as they have not met their substantial burden.

## *Conclusion*

1. Sidney Rothberg was domiciled in Philadelphia, Pennsylvania at the time of his death. As a result, the Register of Wills in Philadelphia County had jurisdiction to issue letters and to probate the will written on January 21, 2002.

34

2. The 2002 Will was not the product of undue influence.

3. The 2002 Will was not the product of an insane delusion.

4. The 2002 Will was not procured through fraud.

5. The 2002 Will was validly executed according to the requirements of 20 Pa. C.S. § 2501 and § 2502 and was not procured through forgery.

BY THE COURT:

_____
                                    J.

# COURT OF COMMON PLEAS OF PHILADELPHIA
## ORPHANS' COURT DIVISION

### O. C. No. 673 AP of 2009
### Estate of SIDNEY ROTHBERG, Deceased

Control Number: 140649

E-Filing Number: 1402033959

### DECREE

**AND NOW**, this 18th day of July, 2014, upon consideration of the "Motion for Statement As to What Claims and Issues Will Be Determined by the Court of Common Pleas, Orphans' Court Division," filed on February 21, 2014, bearing E-Filing Number 1402033959 and Control Number 140649, it is hereby **ORDERED** and **DECREED** that said "Motion for Statement" is **DISMISSED** as being **MOOT**.

This Decree is entered because appropriate Relief has been Granted by separate Opinion bearing evendate herewith.

Sidney Rothberg, Appeal From Register

20090067302320

BY THE COURT:

_____ J.

Neal Cartusciello, Esq.
James A. Kozachek, Esq.
for Petitioner

Karl Prior, Esq.
Jennifer DiVeterano Gayle, Esq.
    for Respondent

Lynn Kearney
    Petitioner, *pro se*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2015, I caused to be served the foregoing document upon the persons and in the manner indicated below which service satisfies the requirements of Pa. R.A.P. 121:

Service by email and first class mail addressed as follows:

Karl Prior, Esquire
Mannion Prior, LLP
840 First Avenue, Suite 100
King of Prussia, PA 19406-1459
     Counsel for Saranne Rothberg Marger

James A. Kozachek, Esquire (PA ID # 62296)
Cartusciello & Kozachek, LLC
101 Farnsworth Avenue
Bordentown, NJ 08505
     Counsel for Michael Sidney Rothberg

Hon. Joseph D. O'Keefe 300 City Hall,
Philadelphia, Pennsylvania 19107

         /s/Lynn Rothberg Kearney

         Lynn Rothberg Kearney
         3565 22nd Street
         Boulder, CO 80304
         Telephone: 303 440 8112
         Petitioner, *Pro se*

Dated: February 4, 2015